INI, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SPALDING PARTNERS, LTD., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
INI, Inc. v. Commissioner
Docket Nos. 3156-93, 3368-94
United States Tax Court
T.C. Memo 1995-112; 1995 Tax Ct. Memo LEXIS 111; 69 T.C.M. (CCH) 2113; March 20, 1995, Filed *111 Decisions will be entered under Rule 155. P1 and P2 were engaged in the management and brokering of real property. As of November 1, 1984, P1 owned 100 percent of P2's outstanding stock and P1 and P2 elected to file consolidated income tax returns for each taxable year ending September 30, thereafter. In May 1988, J and C, the owners of P1, decided to separate P1 and P2, since J and C no longer agreed on how P1 and P2 should be operated. In order to effectuate the separation of P1 and P2, J and C executed various legal documents and transferred various assets and liabilities between P1 and P2. For the taxable year ending September 30, 1989, R issued separate deficiency notices to P2, as a separate entity, and to P1, as agent for the affiliated group consisting of P1 and P2. (R has not challenged the affiliated group's consolidated return for the fiscal year ending September 30, 1988.) Held: Pursuant to an irrevocable proxy coupled with an interest, executed on September 29, 1988, under Georgia law P1 no longer possessed the right to vote any of P2's stock. Thus, as of September 29, 1988, P1 and P2 were no longer an "affiliated group", as defined by sec. 1504(a), I.R.C., and *112 were not eligible to file a consolidated return for the taxable year ending September 30, 1989. Held, further, P2 did not understate its gain by $ 170,000 on the transfer of a building it had received from P1 because P2 was not relieved of a debt in the amount of $ 170,000. Held, further, P1 and P2 are liable for additions to tax for negligence under sec. 6653(a)(1), I.R.C., and for substantial understatement of income tax liability under sec. 6661, I.R.C., to the extent determined herein. For INI, Inc., petitioner: William E. Frantz, John B. Grattan, and Donald B. DeLoach. For Spalding Partners, Ltd., petitioner: Mark S. Lange, Jennifer L. Hampton, and John L. Watkins. For respondent: David Delduco. NIMS
NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In these consolidated cases respondent determined deficiencies in and additions to petitioners' Federal income tax for the fiscal year ending September 30, 1989, as follows: Petitioner Spalding Partners, Ltd.
Additions to Tax Section
Section
Deficiency
6653(a)(1)
6661 $ 413,159
$ 20,658
$ 103,290
Petitioner INI, Inc.
Additions to Tax Section
Section
Deficiency
6653(a)(1)
6661 $ 604,206
$ 30,210
$ 151,052
*113 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues for decision are: (1) Whether petitioners were required to file a consolidated return for the fiscal year ended September 30, 1989; (2) whether the gain of petitioner INI, Inc. on the transfer of the Spalding Building was understated by $ 170,000; (3) whether petitioners are liable for the addition to tax for negligence under section 6653(a)(1); and (4) whether petitioners are liable for the addition to tax for substantial understatement of tax liability under section 6661. Both petitioners are Georgia corporations and had their respective principal offices in Atlanta, Georgia, at the time the petitions were filed. FINDINGS OF FACT Some of the facts were stipulated and are so found. Petitioner Spalding Partners, Ltd. (Spalding) and petitioner INI, Inc. (INI) were incorporated on March 26, 1984, and June 25, 1984, respectively. Initially, both Spalding and INI issued 1,000 shares of common stock of which 500 shares of each were issued to Carl E. Jones (Jones) *114 and 500 shares of each were issued to Ronald K. Cates (Cates). On November 1, 1984, Jones and Cates transferred their shares of INI stock to Spalding. Thus, as of November 1, 1984, Spalding owned 100 percent of INI and Jones and Cates each owned 50 percent of Spalding. From its inception, Spalding has filed returns based on a fiscal year ending on September 30. When Spalding became the 100 percent owner of INI, Spalding and INI elected to file consolidated returns using Spalding's September 30 fiscal year. Spalding and INI were each engaged in the development, management, and brokering of real property during the year in dispute. Additionally, the consolidated entity through Spalding was a partner in Airport Parking Venture I (Carport Partnership), a general partnership engaged in providing parking services at an airport. Donald R. Ricks (Ricks), a C.P.A., was the accountant for both Spalding and INI since their inception. Ricks was involved in the preparation of the consolidated returns filed by petitioners for the fiscal years ending September 30, 1984, through September 30, 1989. Sometime around May 1988, Jones and Cates approached Ricks to discuss the possibility of splitting *115 up Spalding and INI because Jones and Cates had reached a deadlock in terms of managing and operating the consolidated entities. Jones and Cates wanted to devise a plan whereby Jones would acquire exclusive control of INI and Cates would acquire exclusive control of Spalding. As of June 30, 1988, an unsigned memorandum of understanding between Jones and Cates had been prepared by Ricks which provided in pertinent part: Carl E. Jones and Ronald K. Cates each own 50% of the capital stock of Spalding Partners, Ltd., which owns 100% of the stock of INI, Inc. By mutual agreement Carl E. Jones and Ronald K. Cates desire to divide their interests so that, after the succeeding steps are completed, Ronald K. Cates will own 100% of the capital stock of Spalding Partners, Ltd., and Carl E. Jones will own 100% of the stock of INI, Inc.
It is the intent to keep Spalding Partners, Ltd. and INI, Inc., in a parent-subsidiary relationship through September 29, 1988, so that the advantages of a consolidated corporate return will be available for the period ending on that date. On September 30, 1988, Carl E. Jones will assign his stock in Spalding Partners, Ltd., over to the latter-named corporation *116 in exchange for all the outstanding stock of INI, Inc. * * *
Jones and Cates ultimately executed an agreement entitled "Shareholders' Agreement and Plan of Reorganization and Corporate Separation" (the Agreement) which provided in pertinent part: THIS SHAREHOLDERS' AGREEMENT AND PLAN OF REORGANIZATION AND CORPORATE SEPARATION (the "Agreement") is made and entered into as of the 29th day of September, 1988, to be effective as of June 30, 1988, by and among CARL E. JONES ("Jones"), RONALD K. CATES ("Cates"), SPALDING PARTNERS, LTD. ("Spalding"), a Georgia corporation, and INI, INC. ("INI"), a Georgia corporation, (Spalding and INI collectively are hereinafter called the "Companies"). * * * WHEREAS, Jones and Cates have reached an impasse as to the corporate direction of the Companies and as to the types of Buildings and other projects in which the Companies' Business Activities should be primarily engaged and concentrated, and such impasse has resulted in a deadlock in the management of the corporate affairs of both companies; WHEREAS, in order to avoid injury to the Corporations as a result of such deadlock in management, as well as to insulate each of the Corporations from *117 the future liabilities, obligations, and risks associated with the Business Activities of the other, the parties have determined that the following are in their respective mutual best interests: (i) that certain assets and liabilities of Spalding should be transferred to INI, (ii) that certain assets and liabilities of INI should be transferred to Spalding, and (iii) that Jones should exchange all of his Spalding Stock for all of the INI Stock, thus resulting in Jones owning all of the issued and outstanding capital stock of INI and Cates owning all of the issued and outstanding capital stock of Spalding * * *; WHEREAS, Jones and Cates, have entered into a certain Standfast Agreement (the "Standfast Agreement") with Hartsfield Carport Limited ("Hartsfield"), dated December 31, 1988, wherein they both agreed with Hartsfield that until the conditions specified therein had been satisfied (collectively the "Standfast Conditions"), neither Jones nor Cates would participate in a transfer of fifty percent (50%) or more of the issued and outstanding capital stock of Spalding; WHEREAS, the earliest date when such Standfast Conditions might be satisfied is the later of (i) February 1, 1989, *118 or the day immediately after the date Hartsfield fully exercises its option (as defined in the Standfast Agreement) respecting the acquisition from Spalding and others of a 22% partnership interest in the Georgia general partnership, known as Airport Parking Venture I (the "Carport Partnership"), in which Spalding holds a 7.5% Class C partnership interest and also a 15.2% Class D partnership interest * * *; WHEREAS, as a result of the restrictions imposed upon the parties by the Standfast Agreement and by the Partnership Agreement, the Reorganization cannot be fully implemented and no interest in the Partnership can be transferred by Spalding to INI until after the Standfast Conditions have been satisfied and the required written consent of other Partners has been obtained pursuant to the Partnership Agreement, but during the interim period the parties desire to enter into a binding shareholders' agreement providing (i) for the management of the Business Activities of Spalding to be separated and segregated from the management of the Business Activities of INI, with Spalding being managed and controlled by Cates and INI being managed and controlled by INI, (ii) for Jones to be compensated *119 solely from the cash flow of INI and the Partnership, (iii) for Cates to be compensated solely from the cash flow of Spalding and the Partnership; (iv) for Jones to share solely in the profits and distributions of INI and the Partnership, (v) Cates to share solely in the profits and distribution of Spalding and the Partnership; and (vi) for INI and Spalding to share equally in the management, liabilities, cash flow, profits, losses, and other economic benefits and burdens of the Partnership; * * * 6. Management. (a) Generally. Except to the extent provided in Section 5 hereof to the contrary * * *, henceforth the management of the business affairs of Spalding will be controlled exclusively by Cates, and Jones will have no right to participate and no say therein. Similarly, henceforth the management of the business affairs of INI will be controlled exclusively by Jones, and Cates will have no right to participate and no say therein. To this end, Jones hereby resigns as an officer, director, and employee of Spalding * * *. Similarly, Cates hereby resigns as an officer, director, and employee of INI * * *. Additionally, the Board of Directors of Spalding will henceforth *120 be nominated and elected exclusively by Cates. Likewise, the Board of Directors of INI will be nominated and elected exclusively by Jones. * * * SIGNED, SEALED AND DELIVERED the day and year set forth at the beginning hereof, to be effective as of October 1, 1988.
The standfast agreement referred to in the above Agreement was actually executed on December 31, 1987, and the use of the date December 31, 1988, appears to have been a typographical error. The standfast agreement was necessary because of Spalding's participation in the Carport Partnership. The parties understood that Federal tax law considers the transfer of 50 percent or more of the stock of a corporate partner to be a transfer of the corporation's partnership interest which would result in the termination of the partnership. Thus, on December 31, 1987, Jones, Cates, and one of the other partners in the Carport Partnership had entered into the standfast agreement that temporarily restricted Jones and Cates from transferring their respective 50 percent interests in Spalding. In order to have an equitable division of the two corporations, Jones and Cates requested Ricks to value the two corporations' assets as *121 of June 30, 1988. The corporate assets and liabilities were valued by Ricks as of June 30, 1988, as follows: Spalding's Assets and Liabilities
Asset
Value as of 6/30/88
Paper Mill Road property
$   145,729.07
Mercedes automobile
16,000.00
Furniture and fixtures
8,081.33
Spalding Building
3,410,112.19
Loan receivable
128,428.67
Spalding Drive, lot 22
23,057.75 Liabilities
Rental deposits
$    84,889.02
Note payable (Yang)
100,000.00
Accrued property taxes
61,008.83
Accrued unemployment taxes
71.71
Federal and State
unemployment taxes
183.71
Developer fee payable
147,000.00
Trade accounts payable
84,212.89
Note payable (trustees invest.)
2,881,147.44
Accrued interest
620,220.18
Pursuant to the Agreement, Spalding was to transfer the above-listed assets to INI (only a one-half interest in Spalding Drive, Lot 22, was to be transferred), and INI was to assume and/or take certain property subject to the above-listed liabilities. In return, INI was to transfer to Spalding a note payable to INI in the amount of $ 237,543.30 executed by Cates, and Spalding was to assume notes payable by INI in the amounts of $ 268.36 and $ 64,122.01. The Agreement and *122 various other documents necessary to effectuate the corporate splitup were prepared by Judson Simmons (Simmons), a lawyer with the Atlanta law firm of Long, Aldridge & Norman. The Agreement on its face ambiguously provided that it was executed on September 29, 1988, to be effective as of both June 30, 1988 and October 1, 1988. The record does not disclose why the Agreement provided for two different effective dates. However, by letter dated October 18, 1988, Simmons provided to Jones and Cates drafts of the Agreement for their review and comments. As mentioned above, the existence of the standfast agreement between Cates, Jones, and the other Carport Partnership partner prevented Jones from transferring legal title to his 50-percent stock interest in Spalding to Cates. However, Jones and Cates desired to effectuate the corporate division before the fulfillment of the standfast conditions, and to this end they executed irrevocable proxies. Spalding executed an irrevocable proxy in favor of Jones as to Spalding's INI stock, and Jones executed an irrevocable proxy in favor of Cates as to Jones' Spalding stock. Both proxies were notarized by Mary Jane Orr (Ms. Orr), an employee *123 of Spalding and INI. Each proxy, signed by Ms. Orr as notary, bears a date of notarization of September 29, 1988. Each proxy provided that the person in whose favor the proxy was issued had the power: (i) to make written requests that the Corporation call special meetings of the Corporation's shareholders * * *; (ii) to attend all special and annual meetings of the Corporation's shareholders; (iii) to represent the Shareholder at all special and annual shareholder meetings of the Corporation; (iv) to vote the Shares; (v) to execute consents, waivers, and releases with respect to all special and annual shareholder meetings of the Corporation and with respect to voting or otherwise exercising the Shareholder's other rights under the Shares; and (vi) to exercise all other rights of the Shareholder under the Shares for all permissible purposes.
In order to effectuate the property transfers contained in the Agreement several deeds were executed and recorded. By three deeds dated September 29, 1988, Spalding quitclaimed to INI the following real properties: (1) Spalding's remaining 50-percent interest in the Spalding Building located at 8010 Roswell Road; (2) the Paper Mill *124 Road property located in Cobb County; and (3) an undivided one-half interest in Land Lot 22 located on Spalding Drive. INI recorded the deeds pertaining to the Spalding Building and Land Lot 22 on November 2, 1988, whereas the deed pertaining to the Paper Mill Road property was recorded on November 28, 1988. Although all three deeds were dated September 29, 1988, it was not until October 20, 1988, that Jones by letter of that date provided legal descriptions of the three above-mentioned properties to Simmons and requested Simmons to prepare the necessary deeds to effectuate the transfers contemplated in the Agreement. Additionally, Spalding executed an "Assignment of Commercial Leases" dated September 29, 1988, which assigned to INI all of Spalding's rights and interests in any commercial lease pertaining to the Spalding Building. On September 29, 1988, a joint meeting of INI's shareholder and directors was held. Present at this meeting were Michael N. Mantegna (Mantegna), INI's General Counsel, and Jones, in his capacity as President and Director of INI and as the authorized representative of Spalding (INI's sole shareholder) pursuant to the irrevocable proxy issued by Spalding *125 to Jones. At this meeting, the following took place: (1) INI's by-laws were amended to change the number of INI's directors to not less than one; (2) Jones was elected and appointed the sole director of INI; (3) Mantegna was elected and appointed Secretary of INI; and (4) INI determined that it was in its best interests to sell one acre of unimproved land located on Paper Mill Road, which it had acquired from Spalding pursuant to the Agreement. On December 1, 1988, Jones, on behalf of INI, transferred the Paper Mill Road property to Club Properties d/b/a Prodigy Child Development Centers, as was authorized by INI's board and shareholder. Neither Cates nor Spalding received any of the proceeds of this sale. On some unspecified date after Jones and Cates had decided to part ways, Spalding and INI began sharing certain administrative expenses, namely the salaries of Ms. Orr and Sawat Lavantucksin (Lavantucksin), Spalding and INI's bookkeeper. However, as early as July 1988, Lavantucksin totaled various expenses paid through a Spalding bank account and requested 50/50 "capital calls" from Jones and Cates to cover the shared expenses. From September 30, 1988, to January 1989, Jones *126 had signatory authority over Spalding's checking accounts. Between October 3, 1988, and November 3, 1988, Jones signed 15 checks drawn on Spalding's Metro Bank checking account. Additionally, subsequent to September 29, 1988, Jones deposited into two First Union National Bank Accounts in Spalding's name the rent moneys received by INI from tenants of the Spalding Building pursuant to the assignment of commercial leases. These accounts were left in Spalding's name for the sake of convenience, since many of the Spalding Building tenants were still making the checks payable to Spalding. On February 16, 1989, Jones closed these bank accounts and deposited the remaining balances into a bank account in the name of Carl E. Jones Development, Inc. (Development), another company owned by Jones. Trustees Investment, Inc. (Trustees) was the construction lender on the Spalding Building and held a security interest in the building. Trustees had also lent money to Development for the construction of 15 townhomes known as the Glenridge Commons Project (the Project). Trustees and Development had agreed to share the profits and losses of the Project. On February 20, 1989, at a time when INI *127 had $ 170,000 in equity in the Spalding Building, Jones on behalf of INI transferred the Spalding Building to Trustees in lieu of foreclosure and in full satisfaction of the underlying construction loan, since INI had defaulted on its obligation to repay the loan. Additionally, Development owed Trustees $ 170,000 as a result of Development's share of the losses from the Project, which Trustee forgave in exchange for INI's relinquishment of its equity in the Spalding Building. On March 1, 1989, Jones and Cates, individually and as officers of INI and Spalding, respectively, agreed to amend the Agreement. The March 1, 1989, amendment provided that Spalding was to dispose of Spalding's interest in the Carport Partnership and transfer to INI $ 100,000 less one-half of the expenses associated with disposing of Spalding's interest in the partnership. Thereafter, Spalding disposed of its interest in the Carport Partnership and pursuant to the March 1, 1989, amendment Spalding issued a check to INI in the amount of $ 80,051. Prior to the filing by Spalding of a consolidated return for the year ended September 30, 1989, Jones and Cates met with Ricks on several occasions to determine *128 whether Spalding was required to file a consolidated return for that year. Ricks instructed Cates and Jones that petitioners had to file a consolidated return primarily because legal title of the stock of INI had not been transferred from Spalding to Jones. Additionally, Cates requested Simmons's legal opinion as to whether petitioners had to file a consolidated return. In a letter dated November 13, 1989, Simmons addressed Cates' inquiry and gave the following legal opinion: The terms of the Shareholders' Agreement do not impose an affirmative obligation upon Spalding to file consolidated tax returns with INI. * * * We note, however, that the Shareholders' Agreement contemplates that the separation of the two corporations and their reorganization would be effected as soon as possible, and in any event within 90 days, after the satisfaction of the Standfast Conditions. As you know, the Standfast Conditions were satisfied on March 1, 1989. Consequently, under Section 8 of the Shareholders' Agreement, the closing of the Reorganization should have been effected as soon after March 1, 1989 as practicable, and in no event later than June 1, 1989. Apparently through oversight on *129 the part of both Spalding and INI, the Reorganization has not yet been effected. If the parties had completed the Reorganization by the date originally intended, then there would be no basis upon which to file a consolidated return for the fiscal year ended September 30, 1989. We understand, however, that Spalding and INI filed consolidated tax returns for prior years. The Treasury Regulations promulgated under Section 1502 of the Internal Revenue Code provide that, once an election is made to file on a consolidated basis, the consent of the IRS is required to discontinue filing consolidated returns. * * * * * * Based upon our review of the Shareholders' Agreement and our understanding of the circumstances as you have related them, we conclude (i) that Spalding is required under applicable law, but not under the Shareholders' Agreement, to file a consolidated return with INI for the fiscal year ended September 30, 1989, * * *
Ultimately, on October 1, 1989, Jones transferred the legal title of 500 shares of Spalding stock to Cates, as the standfast conditions contained in the Agreement had been fulfilled. On that same date, Spalding transferred legal title to 500 shares *130 of INI stock to Jones. Although Spalding still held legal title to 500 shares of INI stock, all parties agree that Spalding had no interest in INI subsequent to October 1, 1989. On December 14, 1992, respondent issued a notice of deficiency to INI for the fiscal year ended September 30, 1989. This notice treated INI and Spalding as separate filing entities and served as the basis for INI's filing of a petition with this Court. A copy of this notice of deficiency issued to INI was provided to Spalding. On November 30, 1993, respondent issued a notice of deficiency to Spalding, as the agent for the consolidated group consisting of Spalding and INI, for the fiscal year ended September 30, 1989. This notice treated Spalding and INI as a consolidated filing group for the fiscal year ended September 30, 1989, and served as the basis for Spalding's filing of a petition with this Court. On May 31, 1994, Spalding filed with respondent an Amended U.S. Corporation Income Tax Return, Form 1120X on a separate company basis for its taxable year ended September 30, 1989. OPINION 1. The Filing of a Consolidated Return
The first issue for resolution is whether Spalding and INI were *131 required to file a consolidated return for the fiscal year ended September 30, 1989. INI contends that INI and Spalding were required to file a consolidated return. Spalding contends that as of September 30, 1988, Spalding and INI were effectively deconsolidated and thus were not permitted or required to file a consolidated return. Respondent aligns herself with the position advanced by Spalding. Sections 1501 and 1502 are relevant to the disposition of the consolidated return issue and provide as follows: SEC. 1501. PRIVILEGE TO FILE CONSOLIDATED RETURNS. An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated return shall be considered as such *132 consent. In the case of a corporation which is a member of the affiliated group for a fractional part of the year, the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group. SEC. 1502. REGULATIONS. The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.
We first respond to INI's challenge that we lack subject matter jurisdiction regarding the redetermination of the deficiency set out in the notice of deficiency addressed to INI on a separate company basis. INI argues that respondent's regulations issued pursuant to the authority granted by section 1502 are legislative in nature and entitled to be given the force and effect of law. *133 Covil Insulation Co. v. Commissioner, 65 T.C. 364, 374 (1975); Union Elec. Co. of Mo. v. United States, 158 Ct. C1. 479, 305 F.2d 850, 854 (1962). INI then quotes a portion of section 1.1502-77(a), Income Tax Regs., which provides in pertinent part: Common parent agent for subsidiaries. -- (a) Scope of agency of common parent corporation. The common parent, for all purposes other than the making of the consent required by paragraph (a)(1) of section 1.1502 -75, * * *, shall be the sole agent for each subsidiary in the group, duly authorized to act in its own name in all matters relating to the tax liability for the consolidated return year. Except as provided in the preceding sentence, no subsidiary shall have authority to act for or to represent itself in any such matter. For example, * * *; notices of deficiencies will be mailed only to the common parent, and the mailing to the common parent shall be considered as a mailing to each subsidiary in the group; * * *; the common parent will file petitions and conduct proceedings before the Tax Court of the United States, and any such petition shall be considered *134 as also having been filed by each such subsidiary. * * *
Essentially, INI argues that under section 1.1502-77(a), Income Tax Regs., respondent was not authorized to issue a notice of deficiency directly to INI. Thus, INI argues that the notice of deficiency issued directly to INI was invalid because it was issued in direct violation of respondent's regulations. INI contends that as a consequence we lack jurisdiction because respondent failed to issue a valid notice of deficiency, which is a prerequisite to Tax Court jurisdiction. In response to INI's jurisdictional challenge, respondent argues that as of October 1, 1988, INI and Spalding had effectively deconsolidated. As a consequence, respondent argues that INI and Spalding were no longer privileged to file a consolidated return. Thus, respondent contends that section 1.1502-77(a), Income Tax Regs., does not apply to this case because Spalding and INI were not affiliated, as defined by section 1504, as of October 1, 1988, and thus Spalding could not serve as the exclusive agent for INI. In the alternative, and proceeding on the possibility that Spalding and INI remained consolidated as of October 1, 1988, respondent issued *135 a notice of deficiency to Spalding as the common parent of an affiliated group of corporations pursuant to section 1.1502-77(a), Income Tax Regs. This notice of deficiency addressed to Spalding made adjustments that applied both to INI's taxable income independently and also adjustments that applied solely to Spalding's taxable income. Although respondent has asserted inconsistent positions by way of issuing two notices of deficiencies, one based on separate filing status and the other based on a consolidated status, it is well settled that respondent is permitted to assert inconsistent alternative positions. See Estate of Goodall v. Commissioner, 391 F.2d 775, 782 (8th Cir. 1968), affg. on this issue T.C. Memo. 1965-154; Centel Communications Co. v. Commissioner, 92 T.C. 612, 626 (1989), affd. 920 F.2d 1335 (7th Cir. 1990). INI counters respondent's position by arguing that regardless of whether or not INI and Spalding were permitted to file a consolidated return, a consolidated return was in fact filed. Section 1.1502-77(a), Income Tax Regs., appoints the common *136 parent as the exclusive agent to deal with disputes pertaining to the tax liability for a "consolidated return year." Section 1.1502-1(d), Income Tax Regs., defines a "consolidated return year" as a "taxable year for which a consolidated return is filed or required to be filed by such group." (Emphasis added). Whether or not Spalding and INI were required to file a consolidated return for the fiscal year ended September 30, 1989, is the question that we must ultimately decide. However, INI correctly asserts that because a consolidated return was in fact filed, then under section 1.1502-1(d), Income Tax Regs., the fiscal year ended September 30, 1989, was considered a consolidated return year regardless of whether or not such a return was required. Yet, our jurisdiction over INI's case stemming from INI's filing of a petition in response to the notice of deficiency issued directly to INI is not to be defeated, for the reasons discussed below. INI is of course correct when it argues that a valid notice of deficiency is a prerequisite to our jurisdiction. See Stamm Intl. Corp. v. Commissioner, 84 T.C. 248, 252 (1985). However, INI disregards a *137 significant portion of section 1.1502-77(a), Income Tax Regs, which provides: "Notwithstanding the provisions of this paragraph, the district director may, upon notifying the common parent, deal directly with any member of the [consolidated] group in respect of its liability, in which event such member shall have full authority to act for itself." As previously mentioned, section 1501 provides that any member of a consolidated group by filing a consolidated return consents to be bound by the regulations prescribed under section 1502. Thus, INI consented not only to let Spalding act as its agent in a dispute with respondent but also to have respondent deal directly with INI should respondent chose to do so, provided that Spalding be given notice of this intention. At the time respondent issued the notice of deficiency to INI on a separate company basis, respondent also furnished a copy of the notice of deficiency to Spalding. Thus, in compliance with section 1.1502-77(a), Income Tax Regs., Spalding was given the requisite notice that respondent intended to deal directly with INI. This being the case, the notice of deficiency issued to INI was valid, which when responded to by INI's *138 petition serves as a valid basis for our jurisdiction over INI's case. Under section 1501, an affiliated group of corporations has the privilege of filing a consolidated return. This privilege is exercised by election and once an election to file a consolidated return is made, an affiliated group must continue to file consolidated returns unless the consent of the Commissioner to discontinue filing consolidated returns is obtained, or unless there is a disqualification, as hereinafter discussed. Section 1.1502-75(a) and (c), Income Tax Regs.
An "affiliated group" is defined in section 1504(a), which provides in pertinent part: (a) AFFILIATED GROUP DEFINED. -- For purposes of this subtitle -- (1) In General. -- The term "affiliated group" means -- (A) 1 or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation, but only if -- (B)(i) the common parent owns directly stock meeting the requirements of paragraph (2) in at least 1 of the other includible corporations, and (ii) stock meeting the requirements of paragraph (2) in each of the includible corporations (except the common parent) *139 is owned directly by 1 or more of the other includible corporations.
(2) 80-Percent Voting And Value Test. -- The ownership of stock of any corporation meets the requirements of this paragraph if it -- (A) possesses at least 80 percent of the total voting power of the stock of such corporation, and
(B) has a value equal to at least 80 percent of the total value of the stock of such corporation. [Emphasis added.]
The above version of section 1504(a) was added to the Internal Revenue Code by section 60(a) of Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 577-578. The House report on section 60(a) of Pub. L. 98-369 provides: Once two corporations are properly included in a valid consolidated return, they will continue being an affiliated group for consolidated return purposes unless one ceases to own stock, * * *, (1) possessing at least 80 percent of the voting power of all classes of stock, * * * [H. Rept. 98-861, 1984-3 C.B. (Vol. 2) 85-86.]
As of November 1, 1985, Spalding and INI qualified as an affiliated group because Spalding became the direct owner of 100 percent of INI's only class of stock. Once Spalding acquired *140 100 percent of INI's stock, Spalding and INI elected to file consolidated returns. Having made this election, Spalding and INI were required to continue filing consolidated returns until either (1) Spalding obtained the consent of the Commissioner to discontinue filing consolidated returns, or (2) Spalding and INI no longer qualified as an affiliated group within the meaning of section 1504(a). Because the consent of the Commissioner to discontinue filing a consolidated return was never sought by Spalding, petitioners were required to file a consolidated return for the fiscal year ended September 30, 1989, unless they were no longer affiliated as of October 1, 1988 (the first day of Spalding's 1989 fiscal year). In the event that Spalding and INI's affiliation terminated at any time during the 1989 fiscal year, then a consolidated return covering the portion of the year in which petitioners were affiliated would have been required, whereas the remainder of the year should have been reported on a separate company basis. See sec. 1.1502-76(b)(2) and (3), Income Tax Regs.
Although Spalding did not transfer legal title to its INI stock to Jones until October 1, 1989, all parties *141 agree that the 80-percent direct ownership test of section 1504(a) looks to beneficial ownership rather than bare legal title. See Miami Natl. Bank v. Commissioner, 67 T.C. 793 (1977). In Miami Natl. Bank v. Commissioner, supra at 798-799, we interpreted the direct ownership test of section 1504(a) as follows: "Direct" is not used to restrict ownership to those situations in which the corporation has legal title to the stock. Corporations which are in effect one business unit because of their actual ownership have been allowed to file a consolidated return, regardless of who is the record owner of the stock. See S. Rept. No. 960, 70th Cong., 1st Sess. 14-15 (1928). Lavenstein Corp. v. Commissioner, 25 F.2d 375, 376 (4th Cir. 1928), revg. 6 B.T.A. 1134 (1927); Macon, Dublin & Savannah Railroad Co., 40 B.T.A 1266, 1273 (1939); Thomas F. Bayard, Trustee, 38 B.T.A. 778, 788 (1938). If consolidation were allowed to turn on mere legal or record ownership, then corporations with no real common ownership *142 or economic relationship could consolidate their income and deductions, in clear violation of the statutory purpose. See Lavenstein Corp. v. Commissioner, supra at 377; Macon, Dublin & Savannah Railroad Co., supra at 1273.
We accordingly held that the ownership referred to in section 1504(a) is beneficial ownership regardless of the arrangement by which it is created. Id. at 801. Thus, the relevant inquiry becomes whether Spalding transferred beneficial ownership of its INI stock to Jones at any time prior to, at the inception of, or during, the fiscal year beginning October 1, 1988, and ending September 30, 1989. For purposes of determining whether beneficial ownership of Spalding's INI stock had been transferred to Jones, we must look at the legal documents that were executed and the rights created thereby. Miami National Bank v. Commissioner, supra at 800. Additionally, in carrying out this task, we look to State law as well as the intent and agreement of the parties. Id. at 803; see also Estate of Craft v. Commissioner, 68 T.C. 249, 263 (1977) *143 (a "fundamental principle of tax law [is] that State law creates legal rights and property interests while Federal law determines what, and to what extent, interests or rights, so created shall be taxed.") affd. without published opinion 608 F.2d 240 (5th Cir. 1979). As demonstrated below, the execution of the irrevocable proxy by Spalding in favor of Jones as to Spalding's INI stock, once effective, was sufficient to cause Spalding and INI no longer to be affiliated, as that term is defined by section 1504(a). Thus, so long as the proxy was effective no later than September 30, 1988, Spalding and INI would no longer be affiliated as of that date and would not be permitted to file a consolidated return for any part of the fiscal year ended September 30, 1989. In the event that we were to determine that the execution of the irrevocable proxies occurred sometime after September 30, 1988, it would then become necessary for us to determine when the Agreement became effective and whether it was sufficient to deconsolidate the entities. "Affiliated group," as defined by section 1504(a), requires that the parent must beneficially own at least 80 percent of *144 the subsidiary's stock measured by both total value and total voting power. In a similar context, the Claims Court has defined voting power as follows: Voting power is not merely the holding of voting stock shares. Rather, the ultimate expression of voting power is the ability to approve or disapprove of fundamental changes in the corporate structure, and the ability to elect the corporation's board of directors. L. Solomon, R. Stevenson, Jr. & D. Schwartz, Corporations Law and Policy ch. 3, at 26 (1982). [Hermes Consol., Inc. v. United States, 14 Cl. Ct. 398, 405 (1988).]
Georgia law provides that a proxy is revocable unless it is coupled with an interest and by its terms expressly provides that it is irrevocable. Ga. Code Ann. sec. 14-2-722(d) (Michie 1994). Specifically, section 14-2-722(d)(2) of the Georgia Code provides that the appointment of a proxy coupled with an interest includes a proxy executed in favor of "A person who purchased or agreed to purchase the shares". INI does not dispute the proposition that the execution of the irrevocable proxies was sufficient to deconsolidate the entities. Rather, INI argues that the record *145 establishes that neither the Agreement nor the proxies were in fact executed on or before September 29, 1988. Both the Agreement and the proxies indicate on their face that they were executed on September 29, 1988. However, INI has introduced credible evidence that the Agreement was not in fact executed on September 29, 1988, but rather was executed no earlier than late October 1988 and then backdated to be effective as of no later than September 29, 1988. Essentially, we agree with INI that the record discloses that the Agreement was not in fact executed on or before September 29, 1988. However, we cannot say the same for the irrevocable proxies. As already mentioned, the control test contained in section 1504(a) requires that the parent beneficially own at least 80 percent of the voting power of all classes of stock issued by the subsidiary. Spalding gave Jones an irrevocable proxy to vote all of INI's issued stock; thus, once this proxy became effective Spalding could not satisfy section 1504's 80 percent voting power requirement. The irrevocable proxy executed by Spalding in favor of Jones was dated September 29, 1988. The proxy expressly provided that it was irrevocable *146 and that it was coupled with an interest. The proxy was coupled with an interest because Jones may be treated as a person who agreed to purchase the shares in the future in exchange for his stock in Spalding. Thus, under Georgia law Spalding could not revoke Jones' right to vote the INI stock held in Spalding's name. Unlike the Agreement, there is no evidence in the record that the proxies were executed on a date other than September 29, 1988. In fact, the proxy was notarized by Ms. Orr, a licensed notary in the State of Georgia. Just above Ms. Orr's signature, as a notary, is the phrase "Signed, Sealed, and Delivered this 29 day of Sept., 1988, in the presence of:". Georgia Law provides in pertinent part: "in documenting a notarial act, a notary public shall sign on the notarial certification, by hand in ink, only and exactly the name indicated on the notary's commission and shall record on the notarial certification the exact date of the notarial act." Ga. Code Ann. sec. 45-17-8.1 (Michie 1990) (emphasis added). Without proof to the contrary, we are not prepared to speculate that Ms. Orr would have exposed herself to criminal sanctions by falsely dating the notarization. *147 The record contains additional evidence that the proxy was in fact executed by September 29, 1988. Minutes from a joint meeting of INI's shareholder and directors disclose that a meeting was held on September 29, 1988. Present at the meeting were Mantegna, INI's general counsel, and Jones, in his capacity as president and director of INI and as the authorized representative of Spalding. Pursuant to the irrevocable proxy issued by Spalding to Jones, Jones exercised his right to exclusively vote Spalding's INI stock. Among other things, Jones elected himself the sole director of INI. Although INI went to great length to offer proof that the Agreement was not in fact executed on or prior to September 30, 1988, the same cannot be said for the proof that INI offered to show that the proxies had not in fact been executed on September 29, 1988. The only evidence INI offered in support of its proposition that the proxies had not in fact been executed on September 29, 1988, is a letter dated October 25, 1988, drafted by Jack Sawyer (Sawyer), an attorney with Long, Aldridge & Norman, wherein Sawyer forwarded to Jones, as requested by Simmons, the Agreement, proxies, and quitclaim deeds. *148 INI has offered no evidence which suggests that the proxies enclosed with the letter dated October 25, 1988, were in fact not previously executed. Rather, INI attempted to prove that Spalding and INI had not deconsolidated on or prior to September 30, 1988, by establishing that Jones was still writing checks on the Spalding bank accounts after September 30, 1988. We find INI's argument on this point unpersuasive. The record establishes that Jones was still writing checks on the Spalding bank account pursuant to his agreement with Cates to share certain expenses; namely, the salaries of Mr. Lavantucksin and Ms. Orr, who both continued to work for the two entities. The fact that Jones was still writing checks on the Spalding account does not establish that the proxies had not been executed on September 29, 1988. Additionally, our conclusion is not contradicted by the fact that subsequent to September 29, 1988, Jones deposited into two First Union National Bank Accounts in Spalding's name the rent moneys received by INI from tenants of the Spalding Building pursuant to the assignment of commercial leases. The parties stipulated that these accounts were left in Spalding's name *149 for the sake of convenience, since many of the Spalding Building tenants were still addressing their checks to Spalding. On February 16, 1989, Jones closed these bank accounts and deposited the remaining balances into a bank account in the name of Development, another company owned and operated by Jones. These events do not contradict our conclusion that INI and Spalding were deconsolidated not later than September 29, 1988; rather, we find the events to be consistent with the winding up of Spalding's and INI's consolidated affairs. From the above, we determine that as of September 29, 1988, Spalding had irrevocably transferred the exclusive right to vote its INI stock to Jones. Nowhere in the record has INI produced evidence that would establish that the proxies were not in fact executed on September 29, 1988. Paramount to section 1504(a)'s definition of affiliation is that the parent possess at least 80 percent of total voting power of the subsidiary stock. As of September 29, 1998, Spalding did not possess any of the power to vote INI's stock; thus, as of that date Spalding and INI were no longer affiliated as defined by section 1504(a). Furthermore, all of the actions of *150 Spalding, INI, Jones, and Cates after that date were consistent with the expressed intent of Jones and Cates to wind up the affairs of the consolidated entity and to operate INI and Spalding as separate, independent entities after that date. We hold that the proxies were not only executed on September 29, 1988, but also were sufficient to deconsolidate the entities as of September 29, 1988. Although the parties went to great lengths to prove when the Agreement was executed, we find it unnecessary to determine the exact date of execution, because we have concluded that the proxies coupled with an interest in and of themselves were sufficient to deconsolidate the entities as of September 29, 1988. We have considered INI's remaining arguments on the issue of consolidation and find them unpersuasive. 2. The Transfer of the Spalding Building
Regarding the transfer by INI of the Spalding Building to Trustees in lieu of foreclosure, respondent asserts that INI understated its gain by $ 170,000. At the time of the transfer, the fair market value of the Spalding Building exceeded the balance of the outstanding construction loan by $ 170,000; thus, INI had an equity of $ 170,000 *151 in the building. Instead of remitting this amount to INI, Trustees agreed to discharge Development's $ 170,000 share of the losses from the Project that Development owed to Trustees pursuant to Development's and Trustee's agreement to share the profits and losses from the Project. On brief, respondent cites cases that hold that if a debtor transfers property to a creditor in satisfaction of the transferor's indebtedness to the transferee, then the transfer is treated as a sale or other disposition of the property in which the transferor's amount realized includes the amount of the debt discharged by the transfer. See Danenberg v. Commissioner, 73 T.C. 370, 380-381 (1979); Bialock v. Commissioner, 35 T.C. 649, 650 (1961). Respondent is correct when she argues that the transfer of property in satisfaction of the transferor's indebtedness is treated as a sale or other disposition of the property. However, respondent's argument in this case is flawed because in this case the transferor, INI, was not indebted to Trustees, the transferee. Rather, Development, a corporation owned by INI's shareholder, Jones, was the debtor. *152 As such, the cases relied on by respondent do not apply, and we cannot sustain respondent's determination on this basis. We note that there are cases in which the transfer of funds by one corporation to another corporation owned by the same controlling shareholder may give rise to a constructive dividend to the controlling shareholder, where the transfer was for the benefit of the controlling shareholder and not the transferor corporation. See United States v. Mews, 923 F.2d 67 (7th Cir. 1991); Equitable Pub. Co. v. Commissioner, 356 F.2d 514 (3rd Cir.1966), affg. per curiam Knipe v. Commissioner, T.C. Memo. 1965-131. But in such cases the constructive dividend would be income to the shareholder, not the transferor corporation. In the case before us, Jones, INI's shareholder, is not a party. We also note that respondent has not argued that section 311(b) would require INI to realize gain on a constructive distribution of appreciated property to Jones, and we therefore will not further address this possibility. In sum, we hold that because the transferor, INI, was not indebted to the *153 transferee, Trustees, INI is not required to include the discharged debt in INI's amount realized under section 1001(b). 3. The Additions to Tax
As to both petitioners, respondent has asserted additions to tax under section 6653(a)(1) for negligence and section 6661 for substantial understatement of income tax. Petitioners have the burden of proving that the additions to tax determined by respondent are not applicable. Billman v. Commissioner, 83 T.C. 534, 541 (1984), affd. 847 F.2d 887 (D.C. Cir. 1988); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Negligence is defined as the failure to exercise the care that an ordinary and reasonably prudent person would exercise under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Spalding argued at great length that the addition to tax for negligence under section 6653(a)(1) is not applicable because it relied in good faith upon the professional advice of Ricks that a consolidated return was required to be filed. Although reliance on the advice of professionals may form the basis for a *154 successful defense against the imposition of an addition to tax for negligence, see United States v. Boyle, 469 U.S. 241 (1985); Woodbury v. Commissioner, 49 T.C. 180, 200 (1967), Spalding's reliance argument is misplaced. Spalding relied on Rick's advice in deciding to file a consolidated return for the fiscal year ended September 30, 1989. However, we have determined that a consolidated return should not have been filed; no part of the deficiency for which Spalding is separately liable stems from the filing of a consolidated return. Rather, the deficiency that is applicable to Spalding stems from adjustments made to Spalding's taxable income that are unrelated to the affairs of INI. Spalding failed to offer any proof that it was not negligent or that it relied on Rick's advice when it asserted certain positions on the return that related solely to its taxable income to which respondent has made specific adjustments. We therefore hold that Spalding is liable for the addition to tax for negligence under section 6653(a)(1). The negligence addition applies to the entire underpayment if any part of the underpayment is *155 due to negligence. Section 6661 imposes an addition to tax equal to 25 percent of any underpayment of tax which is attributable to a substantial understatement of income tax for the taxable year. Under section 6661(b) a corporate taxpayer's understatement of tax is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 10,000. Under section 6661(c), respondent has the authority to waive the addition to tax where it is demonstrated that there existed reasonable cause for the understatement and that the taxpayer acted in good faith. Spalding argues that respondent abused her discretion by refusing to waive the substantial understatement addition to tax under section 6661(c) because Spalding reasonably and in good faith relied on Rick's advice to file a consolidated return. Again, Spalding's argument is misplaced in that the deficiency applicable to Spalding is unrelated to Spalding's decision to file a consolidated return. Thus, to the extent that Spalding substantially understated, as defined by section 6661(b), its income tax liability, we sustain the addition to tax under section 6661 as against Spalding. INI did not offer any *156 proof nor did it argue on brief that it was not liable for the addition to tax for negligence under section 6653(a)(1); thus, we sustain respondent's determination of this addition to tax. In response to the addition to tax for substantial understatement of tax liability under section 6661, INI makes the same argument that Spalding made. INI argues that respondent abused her discretion in failing to waive the addition to tax under section 6661(c) because INI relied in good faith upon the advice of both Ricks and the law firm of Long, Aldridge & Norman in deciding to file a consolidated return with Spalding. As was the case with Spalding, INI's argument is misplaced as to those components of the deficiency for which INI is separately liable that are unrelated to the consolidated return issue. Thus, to the extent that the understatement of income tax for which INI is separately liable satisfies the definition of "substantial understatement", as provided by section 6661(b)(1)(A), we sustain the addition to tax under section 6661 as asserted against INI. To reflect the foregoing, Decisions will be entered under Rule 155.