T.C. Memo. 2001-236

UNITED STATES TAX COURT

JOEL AND PAULA FRIEDLAND, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14267-99.                    Filed September 10, 2001.

<u>Samuel C. Ullman</u> and <u>Alex Rubio</u>, for petitioners.

<u>Sergio Garcia-Pages</u> and <u>Andrew M. Tiktin</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a deficiency of
$165,919 in and an accuracy-related penalty of $33,184 pursuant
to section 6662(a)[1] on petitioners' 1992 Federal income tax.  The
primary issue for decision is whether petitioners had a gain in

_____

[1]  All section references are to the Internal Revenue Code
in effect for the taxable year in issue, and all Rule references
are to the Tax Court Rules of Practice and Procedure.

1992 on Joel Friedland's (Mr. Friedland) transfer of 6,842 shares of United Bankshares, Inc., stock pledged to United National Bank in 1991.  If we conclude that petitioners did have a gain, then we must decide whether petitioners are entitled to a deduction equal to the amount realized on this transfer.  If the Court holds for respondent on both issues, then we must address petitioners' liability for the accuracy-related penalty.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.  Petitioners are husband and wife.  At the time they filed the petition, petitioners resided in Bal Harbour, Florida.  Petitioners filed a joint income tax return for 1992 using the cash method of accounting.

A.  Mr. Friedland's Association With United National Bank and United Bankshares, Inc.

Starting in 1963, Mr. Friedland was a shareholder and director of First National Bank of Hialeah (FNBH) together with Gerald Katcher (Katcher) and Howard Scharlin (Scharlin).  In 1977, shortly after FNBH was sold to an outside group, Katcher and Scharlin purchased the stock of a nationally chartered bank that later became United National Bank (UNB).  Katcher and Scharlin asked Mr. Friedland to join them as a shareholder and director of UNB, and he did.  In September 1981, the shareholders of UNB transferred their shares to United Bankshares, Inc. (UBI),

in exchange for all the stock of UBI. During 1992, UNB still was a wholly owned subsidiary of UBI.

Scharlin and Katcher were UBI's principal shareholders--each owned approximately 35 percent of the total issued and outstanding shares of UBI stock. From the creation of UBI until January 1991, Mr. Friedland owned approximately 3 percent of the issued and outstanding shares of UBI stock. From 1985 through 1992, Mr. Friedland sat on the board of directors of UNB and UBI along with Katcher, Scharlin, and other individuals.

B.  UNB's Loans to Mark Friedland's Corporations

Centrum Corporation (CC) was a Florida corporation organized in 1984 to develop retail shopping centers. Petitioners' adult son, Mark Friedland (Mark), was the majority shareholder--owning 50 percent of the outstanding stock--and president of CC.

During the mid-1980's, Mark was a successful real estate developer, having developed a number of shopping centers for Publix, a large grocery store chain. CC formed separate wholly owned subsidiaries for each shopping center it developed. CC organized Centrum Hillsboro Corporation (CHC) to take ownership of real estate located at the intersection of Hillsboro Boulevard and Lyons Road in Broward County, Florida (the Hillsboro property). Mark was the president of CHC. Petitioners were not officers, directors, shareholders, or employees of CC or CHC.

As evidenced by a promissory note dated April 19, 1985, CC

borrowed $750,000 from UNB (the $750,000 loan).  As evidenced by a promissory note dated June 1, 1987, CHC borrowed $2.6 million from UNB (the $2.6 million loan).  CHC used the proceeds of the $2.6 million loan to acquire the Hillsboro property.  To secure its obligations under the $2.6 million loan, CHC conveyed to UNB a purchase money mortgage on the Hillsboro property.  As a result of a cross-default agreement, the mortgage also secured the $750,000 loan.  Mark, in his individual capacity, executed a personal guaranty with respect to the $750,000 loan and the $2.6 million loan (together, the Centrum loans).

Although Mr. Friedland was a member of UNB's board of directors when UNB made the Centrum loans, he did not participate in the decision-making process with respect to the Centrum loans. CHC's application for the $2.6 million loan did not satisfy the criteria necessary for the loan to be extended.  After this was brought to Scharlin's attention, he called Mr. Friedland to discuss the situation.  The exact details of this conversation are unclear; however, Mr. Friedland told Scharlin that UNB would not lose money if it went forward with the $2.6 million loan. Mr. Friedland felt comfortable stating this because Mark had been successful in the real estate business and the Hillsboro property was a good development site.  Scharlin informed Katcher of his conversation with Mr. Friedland, and thereafter UNB approved the $2.6 million loan.

In February 1989, Scharlin, Katcher, and Mr. Friedland met for lunch. The three spoke about refinancing Mark was seeking from Chase Manhattan Bank. During the lunch, Mr. Friedland reiterated that UNB would "not get hurt" on the Centrum loans.

During 1988 and 1989, CC and CHC consistently were unable to service the Centrum loans. By late 1990, the Centrum loans were nonperforming. At this time, CC and its subsidiaries were experiencing significant financial difficulties. In addition to the amounts owed to UNB, CC owed other creditors in excess of $60 million--the majority of which Mark had guaranteed. These loans were in default, and, in many cases, the properties securing the loans were deeded back to the creditors in lieu of foreclosure. At this time, Mark's personal guaranty was worthless.[2]

Around this time, Scharlin placed a call to Mr. Friedland to inform him that the Centrum loans "were in trouble". Scharlin reminded Mr. Friedland that he had stated that UNB would not lose any money on the Centrum loans and asked Mr. Friedland to "take care of it". At this time, Mr. Friedland sought advice from his attorney, Aaron Podhurst,[3] regarding whether his statements created any legal obligation to UNB on the $2.6 million loan. Mr. Podhurst advised Mr. Friedland that they did not.

---

[2] Ultimately, in February 1995, Mark commenced a bankruptcy proceeding.

[3] Mr. Podhurst also was a member of UNB's board of directors.

## C.   Mr. Friedland's Transfers of UBI Stock to UNB

### 1.   1991 Agreement

Mr. Friedland executed an agreement (the 1991 agreement) UNB presented to him dated January 3, 1991, in which Mr. Friedland transferred 5,518 shares of his UBI stock to UNB.  Mr. Friedland also pledged and granted a security interest to UNB in his remaining 6,857 shares of UBI stock (the pledged stock) to secure, upon the foreclosure sale or other disposition of the Hillsboro property by UNB, an amount equal to one-half of the excess of the amount owed to UNB on the $2.6 million loan and the amount realized by UNB upon disposition of the Hillsboro property (the loan deficiency).[4]  The 1991 agreement further provided that UNB had no recourse against Mr. Friedland's assets other than the pledged stock, Mr. Friedland had no personal obligation on the $2.6 million loan, and Mr. Friedland's sole future involvement with the $2.6 million loan was his pledge of the pledged stock. UNB accepted the 5,518 shares of UBI stock as full payment of the $750,000 loan[5] and released Mark from his guaranty of the $2.6

_____

[4]  Mr. Friedland retained the right to substitute cash in the amount of the book value of the pledged stock as collateral under the 1991 agreement.

[5]  On Jan. 15, 1991, UNB recorded on its books the fair market value of the 5,518 shares of UBI stock Mr. Friedland conveyed to it pursuant to the 1991 agreement as $468,750.  On Feb. 1, 1991, UBI redeemed those shares from UNB for that amount. UNB released CC and Mark from liability under the $750,000 loan and charged off $280,154--the difference between the $748,904

(continued...)

million loan.  On January 10, 1991, in order to perfect its security interest, UNB took possession of the pledged stock.

Shortly after execution of the 1991 agreement, Scharlin sent Mark a special warranty deed by which CHC would convey to UNB[6] the Hillsboro property in lieu of UNB's instituting foreclosure proceedings with respect to the property.  On January 22, 1991, Mark executed the deed in his capacity as president of CHC.

### 2.  1992 Agreement

UNB had difficulty selling the Hillsboro property, and it became increasingly clear that UNB would sustain a loss on the $2.6 million loan.[7]  As a result, Scharlin asked Mr. Friedland to transfer outright to UNB the pledged stock.  UNB and Mr. Friedland thereafter entered into an agreement dated May 14, 1992 (the 1992 agreement).  The 1992 agreement required Mr. Friedland to relinquish all rights, claims, and interest in 6,842 shares of the pledged stock.  UNB agreed to release and return to Mr. Friedland the remaining 15 shares of the pledged stock that represented the minimal investment necessary for Mr. Friedland to

---

[5](...continued)
then-outstanding balance on the $750,000 loan and the $468,750 redemption proceeds.

[6]  The grantee actually was a subsidiary of UNB formed for the purpose of holding real estate.

[7]  UNB was not able to sell the Hillsboro property until February 1995.

remain a member of UNB's board of directors.  UNB valued the 6,842 shares of UBI stock at $692,495.[8]

## OPINION

Section 1001(a) provides that the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the taxpayer's adjusted basis in the property.  Section 1001(b) defines the amount realized from the sale or other disposition of property as the sum of any money plus the fair market value of property received.  See also sec. 1.1001-1(a), Income Tax Regs.  The amount realized includes the amount of liabilities from which the transferor is discharged as a result of the transaction.  See sec. 1.1001-2(a)(1), Income Tax Regs.

Respondent determined that Mr. Friedland had a gain on the transfer of the 6,842 shares of the pledged stock to UNB.[9]  Respondent argues Mr. Friedland had an amount realized equal to the value of the 6,842 shares of the pledged stock he transferred to UNB in 1992 to obtain UNB's release of Mark, petitioners' son, from his guaranty and UNB's forgiveness of the Centrum loans.

---

[8]  UNB management considered this amount to be the fair market value of the stock.

[9]  Respondent concedes that in calculating petitioners' gain pursuant to sec. 1001(a), they are entitled to a $5 per share basis in the UBI stock.  This concession is relevant, however, only if we conclude that Mr. Friedland had an amount realized on the transfer of this stock.

As a preliminary matter, petitioners argue that UNB released Mark from his guaranty of the $2.6 million loan and UNB forgave the $750,000 in the 1991 agreement (which did not effectuate the transfer of the 6,842 UBI shares). We agree.

We found as a fact that UNB released Mark from his guaranty and forgave the $750,000 loan in 1991 in exchange for Mr. Friedland's transfer of 5,518 shares of UBI stock to UNB. See supra pp. 6-7. This transfer from the prior year is not in issue, and respondent's argument in this regard is without merit.

Petitioners also contend that Mr. Friedland did not have an amount realized for purposes of section 1001(b) with respect to the transfer of the 6,842 shares of the pledged stock. Petitioners argue that the only consideration under the 1992 agreement was the cancellation of debt owed to UNB by CHC. Accordingly, petitioners contend that section 1.1001-2(a)(1), Income Tax Regs., is inapplicable because the term "amount realized", although it includes liabilities of the transferor that are discharged as a result of a sale or other disposition of property, does not include forgiveness of indebtedness of a person or entity other than the transferor. Petitioners cite INI, Inc. v. Commissioner, T.C. Memo. 1995-112, affd. without published opinion 107 F.3d 27 (11th Cir. 1997), in support of this argument.

In INI, Inc., Mr. Jones and Mr. Cates were each 50-percent

shareholders of a corporation (Spalding) that was the sole shareholder of another corporation (INI). Mr. Jones and Mr. Cates had differences of opinion regarding the management and operation of Spalding and INI, so they decided to separate. They agreed that Mr. Cates would own 100 percent of Spalding and Mr. Jones would own 100 percent of INI. One of the assets of Spalding was the Spalding Building. As part of the breakup, Spalding transferred the Spalding Building, subject to the liability associated with the property, to INI.

The construction lender on the Spalding Building (Lender) held a security interest in the Spalding Building. Lender also had lent money to a company (Development) owned by Mr. Jones for the construction of 15 townhomes.

INI defaulted on its obligation to repay the loan secured by the Spalding Building. In lieu of foreclosure, and in satisfaction of the construction loan, INI transferred the Spalding Building to Lender; however, the fair market value of the Spalding Building exceeded the balance outstanding on the construction loan by $170,000. At this time, Development owed Lender $170,000 related to the construction of the 15 townhomes (the Development debt). Instead of remitting $170,000 to INI, Lender agreed to discharge Development from the Development debt.

We held that INI, the transferor, did not have to include the discharged Development debt in its amount realized because

Development, a corporation owned by INI's shareholder, and not INI, was indebted to Lender, the transferee.

The facts of this case are comparable to the salient facts of INI, Inc. Mr. Friedland's transfer of 6,842 shares of the pledged stock was not in satisfaction of his own liability--CHC, a corporation owned by petitioners' son, and not Mr. Friedland, was indebted to UNB, the transferee. Therefore, we hold that petitioners did not have to include any part of the discharged debt of CHC (i.e., the $2.6 million loan) in amount realized. See INI, Inc. v. Commissioner, supra; see also Landreth v. Commissioner, 50 T.C. 803, 812-813 (1968) (holding that a guarantor of a loan does not recognize income when the lender discharges the debtor from the loan).[10]

Accordingly, we do not sustain respondent's determination that Mr. Friedland had an amount realized on his transfer of the

---

[10] The Court has stated:

> Where a debtor is relieved of his obligation to repay the loan, his net worth is increased over what it would have been if the original transaction had never occurred. This real increase in wealth may be properly taxable. However, where the guarantor is relieved of his contingent liability, either because of payment by the debtor to the creditor or because of a release given him by the creditor, no previously untaxed accretion in assets thereby results in an increase in net worth. * * *

Landreth v. Commissioner, 50 T.C. 803, 813 (1968) (citations omitted). In the case at bar, petitioners had no untaxed accretion in assets upon the transfer of the 6,842 shares of pledged stock to UBI.

6,842 shares of the pledged stock.  Without an amount realized, petitioners did not have a gain.[11]  See sec. 1001(a).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioners</u>.

---

[11]  Therefore, we need not decide whether petitioners are entitled to a deduction for this transfer or whether they are liable for a penalty pursuant to sec. 6662.