T.C. Memo. 1995-546

UNITED STATES TAX COURT

GEORGE GEORGIOU AND JUDITH GEORGIOU A.K.A. JUDY GEORGIOU, ET AL.,[1] Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 19395-93, 19396-93,    Filed November 16, 1995.
             19397-93.

<u>Richard J. Sideman</u> and <u>Wendy Abkin</u>, for petitioners.

<u>Debra K. Estrem</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income tax as follows:

---

[1]Cases of the following petitioners are consolidated herewith:  Kolonaki Imports, Inc., docket No. 19396-93; and Georgiou Retail Stores, docket No. 19397-93.

| | | | Additions to Tax & Penalties | | | |
|---|---|---|---|---|---|---|
| Docket No. | Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 | Sec. 6662(a) |
| 19395-93 (George & Judith Georgiou) | 1989 | $173,021 | -- | -- | -- | $ 34,604 |
| | 1990 | 667,786 | -- | -- | -- | 133,557 |
| 19396-93 (Kolonaki Imports, Inc.) | 1989 | 88,493 | $4,425 | To be determined | $22,123 | -- |
| | 1990 | 555,515 | -- | -- | -- | 111,103 |
| 19397-93 (Georgiou Retail Stores) | 1989 | 44,261 | 2,214 | To be determined | 11,065 | -- |

(References to the tax year for the corporations are to the applicable fiscal year.)

Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues remaining for decision as to Kolonaki Imports, Inc. (Kolonaki), are: Whether Kolonaki was qualified to file a consolidated return with Judy Alexander, Inc. (JAI), a corporation wholly owned by George Georgiou (Georgiou), for the year ended September 30, 1990; whether Kolonaki is liable for a penalty under section 6662(a) for 1990; and whether Kolonaki is liable for additions to tax under sections 6653(a)(1) and 6661 for 1989. The issues remaining for decision as to Georgiou are: Whether amounts transferred to Georgiou from Kolonaki in 1989 and 1990 constituted loans or constructive dividends; whether a $100,000 home interest deduction claimed by

Georgiou in 1990 can be recharacterized as a business interest expense under section 163(a); whether ownership of JAI stock was transferred from Georgiou to Kolonaki during 1989 or 1990, creating a dividend under section 304; and whether Georgiou is liable for penalties under section 6662 for 1989 and 1990. The issue remaining for decision as to Georgiou Retail Stores (GRS) is whether GRS's cost of goods sold in 1989 must be reduced by $130,181.

                         FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. The Georgious were residents of California, and Kolonaki and GRS had their principal places of business in California, at the time the petitions were filed.

Kolonaki

Georgiou incorporated Kolonaki in California in 1975 as a retail store that sold giftware and clothing from various parts of the world, predominantly merchandise from Greece. Prior to founding Kolonaki, Georgiou had obtained degrees in economics and mathematics and had worked as a systems analyst. Kolonaki was wholly owned by Georgiou from incorporation throughout the years in issue. From 1975 through 1987, Kolonaki expanded to include both wholesale and retail operations. By 1988, the retail division consisted of approximately 26 stores named "Georgiou". The "Georgiou" stores' merchandise consisted primarily of

clothing designed by Georgiou.  The wholesale division sold merchandise to two other corporations, which then sold the goods at retail.  The two other corporations were Naturelle International, Inc., which was owned by Georgiou, and Alexia Clothing, Inc. (Alexia), in which Georgiou was a minority shareholder through 1988.  Alexia had a supply contract with Kolonaki that required Alexia to purchase all of its merchandise from Kolonaki.

During 1988, Georgiou became interested in selling shares in the retail division of Kolonaki to the public.  GRS was incorporated on approximately September 23, 1988, in California to take over Kolonaki's retail operations.  GRS acquired Kolonaki's retail division pursuant to a two-part plan set forth in a document titled "Agreement and Plan of Corporate Separation and Reorganization" (the plan).  As the first part of the plan required, Kolonaki transferred to GRS certain business assets and liabilities associated with Kolonaki's retail clothing business. The assets included all operating retail stores and the assets associated with those stores.  The assets were transferred under section 351, and the stock of GRS was issued in the name of Kolonaki.

The second part of the plan provided that the GRS stock would be distributed to Georgiou as part of a tax-free corporate separation and exchange pursuant to sections 355 and 368.  The reorganization was subject to a condition precedent that required

the parties to obtain an opinion from tax counsel that the transaction would qualify as a tax-free exchange. Because the parties never obtained an opinion, GRS remained a subsidiary of Kolonaki.

In 1988, Georgiou became interested in acquiring the assets of Petite Concept, Ltd. (Petite), a corporation that operated a chain of retail stores known as Karen Austin Petites. The assets consisted primarily of leases, leasehold improvements, and property. Petite had filed bankruptcy in November 1988. Georgiou formed JAI to acquire certain assets of Petite. JAI was incorporated December 13, 1988, with Georgiou as the sole shareholder. Georgiou remained the sole record holder of JAI stock from 1988 through the years in issue. There were several business reasons to form JAI including: Kolonaki had just spun off its retail division into GRS and adding a retail division back to Kolonaki would have been counterproductive; GRS would be a less desirable investment if it attempted to sell shares to the public with a chain of bankrupt stores included in its assets; and Georgiou did not want to provide either the Kolonaki or GRS financial statements to the Petite lessors because several of the lessors were also lessors of GRS stores.

In December 1988, Petite agreed to sell to Georgiou or his nominee the assets of 18 Petite stores. Georgiou funded JAI with $1,186,000 ($234,000 designated as capital and $952,000 designated as three loans). JAI issued 23,400 shares of stock in

Georgiou's name in return for Georgiou's capital contribution. JAI, as Georgiou's nominee, used the funds to purchase the Petite assets from the bankruptcy trustee for $1,250,000. As part of the sale, Georgiou was required to guarantee personally eight of the Petite retail leases that JAI purchased. The value of the eight leases with the guarantees was approximately $5.9 million. Georgiou's liability under the guarantee continued whether the leases were extended, modified, altered, or assigned and irrespective of any bankruptcy, reorganization, or insolvency of JAI.

GRS and JAI were administered identically from their inception. Both purchased their merchandise wholesale from Kolonaki, and they shared management personnel. Georgiou micromanaged the operations of Kolonaki, GRS, and JAI. All decisions, from clothing design to personnel, required his final approval.

In 1989, JAI, in addition to GRS, was being considered for a public offering. Ernst and Young was retained to perform certain financial audits and prepare tax returns. Ernst and Young prepared tax returns for GRS and JAI for the year ended September 30, 1989. The GRS and JAI returns were prepared as separate returns for submission to the Internal Revenue Service (IRS). GRS and JAI each filed a separate 1989 return. The JAI return listed Georgiou as the sole stockholder. GRS was wholly owned by Kolonaki.

The IRS began an audit of Kolonaki in November 1990. Kolonaki's representative at the January 8, 1991, interview and throughout the audit was David Pryor (Pryor), a C.P.A. with Crisafi, Sciabica and Woodward (Crisafi), Georgiou's regular accounting firm. On March 7, 1991, the IRS began an audit of the year ended September 30, 1989. Early in the JAI audit, Pryor informed the IRS agent that Georgiou was the owner of JAI.

In April or May 1991, Georgiou met with Pryor and Robert Woodward, two accountants from the Crisafi firm, to discuss consolidated return treatment for JAI on Kolonaki's September 30, 1990, tax return. Pryor had discovered the beneficial ownership concept in a Bureau of National Affairs, Inc., tax portfolio and presented it to Georgiou. Pryor suggested that a second meeting be held with Georgiou and Lucius P. Bernard (Bernard), Georgiou's attorney, to discuss whether Kolonaki had beneficial ownership of the JAI stock that was issued in Georgiou's name.

Georgiou subsequently met with Pryor and Bernard to discuss consolidated return treatment for JAI on Kolonaki's return. Bernard was not a tax specialist. The meeting concluded with the understanding that JAI could file a consolidated return with Kolonaki, if Kolonaki could establish that it was the beneficial owner of at least 80 percent of JAI stock. It was agreed that a Holding Agreement between Kolonaki and Georgiou would be the best way to document the intention that Kolonaki was the beneficial owner of Georgiou's JAI stock.

The conclusion of the meeting set in motion a number of events. Pryor returned to his accounting firm and made journal entries in Kolonaki's books. The entries reduced Georgiou's liabilities to Kolonaki and replaced them with JAI liabilities to Kolonaki. The entries consisted of debits of $234,000 to "Investment in Judy [JAI]" and $952,000 to "Accounts Receivable, Judy [JAI]" (totaling $1,186,000) and of a credit of $1,186,000 to "Accounts Receivable, Georgiou". The entries were dated "as of 10/1/89" but were actually made sometime after the meeting in 1991.

Entries were made in the JAI books to change notes payable. The entries consisted of a $952,100 debit to "Notes Payable, George Georgiou" and a $952,100 credit to "Notes Payable, Kolonaki". The entries were dated "as of September 30, 1990" on the books but were actually made sometime after January 18, 1991.

As part of the plan to sell shares to the public for JAI and GRS, Ernst and Young prepared the September 30, 1990, tax returns for the two corporations. The GRS tax return was prepared pro forma because Ernst and Young was aware that Georgiou planned to have GRS file a consolidated return with Kolonaki. The JAI tax return was prepared as a separate return with Georgiou listed as the sole stockholder. Ernst and Young signed the JAI return on June 12, 1991, and gave it to Crisafi. Crisafi did not file with the IRS the separate JAI tax return for 1990.

Crisafi prepared Kolonaki's September 30, 1990, tax return. The Kolonaki return claimed consolidated return treatment for JAI and was filed and received by the IRS on June 19, 1991. The Kolonaki return was signed by the chief financial officer for Kolonaki and stated:

> Kolonaki Imports, Inc. is the beneficial owner of Judy Alexander [JAI] pursuant to a holding agreement with George Georgiou, the holder of record and 100% shareholder of Kolonaki. The original 23,400 shares of Judy Alexander [JAI] were originally issued in January and March of 1989 pursuant to this agreement.

The Holding Agreement to which the tax return referred did not exist at the time the return was filed.

On August 6, 1991, a Holding Agreement was drafted to substantiate Kolonaki's beneficial ownership of JAI. The Holding Agreement stated in part:

> WHEREAS, the parties intend, by this Agreement, to cause GEORGE GEORGIOU to own of record all of the issued and outstanding shares of Judy Alexander [JAI], and to hold said shares beneficially for and on behalf of KOLONAKI, and KOLONAKI intends to indemnify and hold GEORGE GEORGIOU harmless from any and all liabilities which he may incur or to which he may be subjected as the owner of said shares of stock.

The Holding Agreement began "This Agreement made this 15th day of October, 1988" and ended "IN WITNESS WHEREOF, the parties have caused these present to be executed the date and year first above written." Georgiou signed the document twice, once in his capacity as president of Kolonaki and once in his individual capacity.

In 1991, a Supply Agreement existed between JAI and Kolonaki.  The original agreement, dated March 1, 1989, and signed by Georgiou, stated:  "RELATIONSHIP OF PARTIES.  JA [JAI] and KOLONAKI are, for all purposes, independent parties."  A September 12, 1991, transmittal letter from Pryor to Bernard directed Bernard to revise the Supply Agreement between Kolonaki and JAI (and Kolonaki and GRS).  The transmittal stated:  "Para. 13: relationship of parties.  Now: JA [JAI] and Kol [Kolonaki] are for all purposes indep[endent] parties.  Change: JA is a sub[sidiary] of Kol.  George has agreed to both."

Revised Supply Agreements were forwarded from Bernard's firm to Georgiou with a September 16, 1991, transmittal letter that stated:  "Enclosed are revised Supply Agreements between Kolonaki and JAI."  The changes to which Georgiou had agreed were in the revised agreement that stated in part:  "RELATIONSHIP OF PARTIES. * * *  The parties acknowledge that all outstanding shares in JA [JAI] are held of record by GEORGE GEORGIOU under a Holding Agreement for the benefit of KOLONAKI."  The revised Supply Agreement was dated September 30, 1989, and was signed twice by Georgiou, once as president for Kolonaki and once as president of JAI.

The Minutes of the First Meeting of the Board of Directors of JAI were dated December 12, 1988.  Georgiou was named sole director, president, secretary, and treasurer.  During that meeting, it was resolved that 10,000 shares of corporate stock at

$10 per share would be issued to Georgiou pursuant to the provisions of section 1244. It was also resolved that the corporation should borrow $400,000 from Georgiou and give him a promissory note for that amount, payable on demand in 5 years, with annual interest payments at the rate of 10 percent per annum.

The March 3, 1989, Minutes of a Special Meeting of the Board of Directors of JAI resolved to issue an additional 13,400 shares of section 1244 stock at $10 per share to Georgiou. It was resolved that the corporation should borrow $536,000 from Georgiou and issue a promissory note in that amount, payable on demand in 5 years, with annual interest payments at the rate of 10 percent per annum.

The August 9, 1989, Minutes of a Special Meeting of the Board of Directors of JAI resolved that the corporation should borrow $16,100 from Georgiou and issue a promissory note in that amount, payable on demand in 5 years, with annual interest payments at a rate of 10 percent per annum.

There were two sets of Minutes of Special Meeting of the Board of Directors of JAI dated September 30, 1989. The minutes resolved to accept a Supply Agreement that required JAI to purchase all of its merchandise from Kolonaki. The original minutes identified Kolonaki as "a California corporation". The September 30, 1989, minutes that were provided to the IRS agent at audit, however, identified Kolonaki differently, stating that

there was a "Supply Agreement between this corporation [JAI] and Kolonaki, this corporation's parent".

In December 1989, Georgiou set up the George Georgiou Living Trust and transferred personal assets into it. Included in the assets were 23,400 shares of JAI stock. The September 15, 1990, Minutes of the Regular Meeting of the Shareholder of JAI listed as present at the meeting: "GEORGE GEORGIOU, Trustee of the George Georgiou Living Trust, Established December 5, 1989-- 23,400 shares."

The September 30, 1990, Meeting Minutes of the Board of Directors of JAI that were given to the IRS agent during the audit no longer named Georgiou as trustee of the JAI stock. These minutes listed Georgiou as present and resolved: "it would be in the best interest of the corporation to elect to file consolidated tax returns with KOLONAKI, a California corporation which is the beneficial owner of all the issued and outstanding shares of this corporation."

Three sets of promissory notes from JAI to Georgiou were prepared. The notes represented the loans Georgiou made to JAI as set forth in the JAI minutes. The notes were for loans of $400,000, $536,000, and $16,100. The notes were dated 1988 and 1989. Some of the notes contained an assignment clause that stated:

ASSIGNMENT

FOR VALUE RECEIVED, I hereby assign to KOLONAKI, a California corporation, all of my right, title and interest in and to the aforesaid promissory note dated December 12, 1988 made by JUDY ALEXANDER [JAI] and payable to GEORGE GEORGIOU in the principal amount of * * * [the loan amounts].

The assignment clauses were signed by Georgiou and dated either September 30, 1989, or September 30, 1990.

Bernard sent a letter to Georgiou dated April 16, 1991. Enclosed with the letter were promissory notes for $400,000, $532,000, and $16,100. The letter stated: "You must sign the Notes * * *, and the Assignment Clause which is on the bottom of each note * * *. Make copies for your accountant to give to the [IRS] auditor."

In August 1991, Georgiou requested a written opinion from Bernard regarding JAI's qualifications to file a consolidated return with Kolonaki. In response to the inquiry, Bernard sent Georgiou a letter dated August 23, 1991, that stated:

Since Kolonaki has the benefits of the ownership of all the shares in Judy Alexander [JAI], pursuant to the Holding Agreement dated October 15, 1988 between Kolonaki and George Georgiou, it seems obvious, without a formal opinion at this time, that the incidents and benefits of ownership of Judy Alexander [JAI] accrue to Kolonaki.

Throughout 1991 and 1992, the IRS agent requested information by issuing information document requests. One specific request was for documents that substantiated Kolonaki's beneficial ownership of JAI. In response to the requests, Pryor

gave the agent the backdated Holding Agreement, Supply Agreement, minutes, and promissory notes.

In a letter dated December 13, 1991, Bernard informed Pryor that Bernard just became aware of the October 15, 1988, date on the Holding Agreement.  The letter stated:

> I discovered, to my chagrin, that the Holding Agreement contains an obvious error which, if not called to the attention of the person to whom it was delivered, could be misleading.
>
> *       *       *       *       *       *       *
>
> As you know, the Holding Agreement was, in fact, drafted on August 6, 1991 to memorialize the understanding which Mr. Georgiou and Kolonaki had reached in October 1988.  * * *

Bernard stated in the letter that the inaccurate date was a typographical error that was the result of "boilerplate" language on his computer.  Bernard asked Pryor to forward the information about the error to the agent.

The agent also requested information from Ernst and Young regarding Kolonaki's beneficial ownership.  In a letter dated February 13, 1992, Ernst and Young informed the agent:  "We first learned in writing of the holding agreement upon receipt of the client representation letter dated September 24, 1991, for the 1990 fiscal year."

Respondent disallowed the JAI loss that was deducted by Kolonaki on Kolonaki's 1990 Form 1120 tax return.

Georgiou

In 1980, Kolonaki extended a line of credit of $500,000 to Georgiou, its sole shareholder.  The credit limit was subsequently increased as follows:

| Date | Amount of Credit Limit |
|---|---|
| Feb. 15, 1980 | $  500,000 |
| Feb. 15, 1982 | 1,000,000 |
| Feb. 17, 1984 | 1,500,000 |
| Feb. 14, 1986 | 2,000,000 |
| June 30, 1988 | 3,000,000 |
| June 30, 1989 | 5,000,000 |
|  |  |

During the years in issue, transactions reflected in Kolonaki's Account 121--Loan to Shareholder can be summarized as follows:

| Year Ended: | Sept. 30, 1989 | Sept. 30, 1990 |
|---|---|---|
| Beginning Balance | $ 757,530 | $1,082,602 |
| Advances to Georgiou | 857,360 | 2,608,562 |
| Repayments | (532,000)[1] | (1,700,909)[2] |
| Ending Balance | $1,082,602 [3] | $1,990,256 [3] |
| | | |

[1]The 1989 repayments consisted of one check for $325,000 dated 9/3/89 and a journal entry of $207,000 that represented an offset of rents that Kolonaki owed Georgiou on the rental of a building owned by Georgiou (the amount was reported on Georgiou's Form 1040).

[2]The 1990 repayments consisted of three journal entries: $1,186,000 "to record investment in Judy Alexander [JAI] as of 10/1/89 for consolidation purposes" (the entry was actually made in April or May 1991); $312,161 "to record Kolonaki loan to Alexia as of 10/1/89"; and $115,000 that stated "George paid the monies to Alexia for Kolonaki's purchase."

[3]The errors in calculations are from Kolonaki's journal and from rounding.

No promissory notes were executed for the advances from Kolonaki's Account 121--Loan to Shareholder from 1980 through the years in issue. No maturity date was set for repayment of the advances. Georgiou did not pledge any collateral as security for the repayment of the advances from 1980 through 1990. Kolonaki did not take any action to enforce the repayment of the amounts advanced to Georgiou. However, a March 28, 1991, letter from Bernard to Georgiou stated:

> Enclosed please find an original and one copy each of Security Agreement, Consent by Directors to Corporation Action dated June 30, 1988 and Consent by Directors to Corporate Action dated June 30, 1989.

* * *  Please sign the originals and return them to me for inclusion in the corporate record book.  * * *

The enclosed Security Agreement was dated February 15, 1980, and gave Kolonaki "a present security interest in collateral described as all of the personal property * * * of DEBTOR [Georgiou], * * * to secure * * * advances under a certain line of credit".  The Consent by Directors document dated 1988 resolved that all advances made under the line of credit to Georgiou shall bear interest at the rate of 10 percent per annum. Interest only payments were due annually, with all unpaid principal due December 31, 1995.

During 1989 and 1990, Kolonaki paid Georgiou a salary of $144,000 and $225,641, respectively.  The Georgious' 1989 and 1990 Form 1040 tax returns show adjusted gross income of $218,281 for 1989 and $283,987 for 1990.  Georgiou stated that he believed the salary he received from Kolonaki was very low.

During 1989 and 1990, Kolonaki had taxable income and retained earnings as follows:

| Year Ended Sept. 30 | Taxable Income | Retained Earnings |
|---|---|---|
| 1989 | $1,149,333 | $2,391,725 |
| 1990 | 1,032,955 | 2,424,499 |

Kolonaki did not pay dividends for either 1989 or 1990.  Kolonaki has never paid dividends for any year since its incorporation.

Georgiou claimed a $100,000 home interest deduction on his 1990 Form 1040 tax return for a portion of the advances that was allegedly used to remodel his private residence.

Respondent determined that Georgiou's withdrawals from Kolonaki's line of credit were constructive dividends and not loans. Respondent further determined that there was no allowable interest expense because the advances were not loans.

GRS

The GRS 1989 Form 1120 tax return represented the value of inventory at the beginning of the year as $935,181. The GRS beginning inventory was transferred from Kolonaki to GRS pursuant to a section 351 exchange for GRS stock. The Kolonaki books reflected the transfer of opening inventory to GRS. The basis of the transferred inventory as it appeared on the Kolonaki books was $805,000.

Respondent reduced the value of opening inventory that GRS represented on its 1989 tax return from $935,181 to $805,000. Respondent maintains that the proper value is the transferor's basis in the property transferred.

OPINION

Kolonaki, Georgiou, and GRS have the burden of proof on all issues. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Rockwell v. Commissioner, 512 F.2d 882 (9th Cir. 1975), affg. T.C. Memo. 1972-133.

I. <u>Kolonaki</u>

Kolonaki asserts that it was the beneficial owner of JAI stock and was entitled to deduct a $1,580,458 net loss from JAI on its 1990 Form 1120 tax return. Respondent contends that Kolonaki was not the beneficial owner of JAI stock and, therefore, not entitled to include JAI on its consolidated return. Respondent acknowledges that beneficial ownership would satisfy the ownership requirement of section 1504(a). Respondent argues, however, that there was no credible documentation to substantiate Kolonaki's beneficial ownership of JAI, only documents that were created or altered and backdated after the audits began.

Kolonaki's right to file a consolidated return depends on whether, during the year in issue, Kolonaki "owned directly", within the meaning of section 1504, at least 80 percent of the voting power of all classes of JAI stock. Under section 1501, an affiliated group has the privilege of making a consolidated return. An affiliated group is defined in section 1504(a) as follows:

> (a) Affiliated Group Defined.--For purposes of this subtitle--
>
>> (1) In general.--The term "affiliated group" means--
>>
>>> (A) 1 or more chains of includible corporations connected through stock ownership with a common parent corporation

which is an includible corporation, but only
if--

(B)(i) the common parent owns directly
stock meeting the requirements of paragraph
(2) in at least 1 of the other includible
corporations, and

(ii) stock meeting the requirements
of paragraph (2) in each of the includible
corporations (except the common parent) is
owned directly by 1 or more of the other
includible corporations.

(2) 80-percent voting and value test.--The
ownership of stock of any corporation meets the
requirements of this paragraph if it--

(A) possesses at least 80 percent of the
total voting power of the stock of such
corporation, and

(B) has a value equal to at least
80 percent of the total value of the stock of
such corporation.

The parties stipulated that Georgiou was the record owner of 100 percent of JAI stock. However, the "direct" ownership requirement in section 1504(a) is not synonymous with legal or record ownership. See Miami National Bank v. Commissioner, 67 T.C. 793 (1977).

"Direct" is not used to restrict ownership to those situations in which the corporation has legal title to the stock. Corporations that are in effect one business unit because of their actual ownership have been allowed to file a consolidated return, regardless of who is the record owner of the stock. Id. at 798-799. See Lavenstein Corp. v. Commissioner, 25 F.2d 375,

376 (4th Cir. 1928), revg. 6 B.T.A. 1134 (1927); <u>Macon, Dublin & Savannah R.R. Co. v. Commissioner</u>, 40 B.T.A. 1266, 1273 (1939); <u>Eastern Util. Inv. Corp. v. Commissioner</u>, 38 B.T.A. 778, 788 (1938). If consolidation depended solely on legal or record ownership, corporations with no real common ownership or economic relationship could consolidate their income and deductions, in violation of the statutory purpose. See <u>Lavenstein Corp. v. Commissioner</u>, <u>supra</u> at 377; <u>Macon, Dublin & Savannah R.R. Co. v. Commissioner</u>, <u>supra</u> at 1273. This Court has thus held that the ownership referred to in section 1504(a) is beneficial ownership, regardless of the arrangement by which it is created. <u>Miami National Bank v. Commissioner</u>, <u>supra</u> at 801; see <u>INI, Inc. v. Commissioner</u>, T.C. Memo. 1995-112.

The issue here turns on whether Kolonaki was the beneficial owner of JAI stock. To determine whether Kolonaki had beneficial ownership of JAI stock, we must look to the legal documents that were executed and the rights created thereby. <u>Miami National Bank v. Commissioner</u>, <u>supra</u> at 800. Additionally, in carrying out this task, we look to the intent and agreement of the parties. <u>Id.</u> at 803. Because courts cannot successfully conjecture as to the subjective intent of the parties, the objective evidence of intent provided by the parties' overt acts must be relied upon. <u>Ragghianti v. Commissioner</u>, 71 T.C. 346, 350 (1978) (citing <u>Pacific Coast Music Jobbers, Inc. v.</u>

Commissioner, 55 T.C. 866, 874 (1971), affd. 457 F.2d 1165 (5th Cir. 1972)), affd. without published opinion 652 F.2d 65 (9th Cir. 1981).

Kolonaki relies primarily on Georgiou's assertion that Georgiou, as Kolonaki's sole shareholder, always intended Kolonaki to be the beneficial owner of the JAI stock. Kolonaki's reliance on Georgiou's subjective intent is misplaced. A corporation and its sole shareholder are separate legal entities if a business purpose exists for the corporation. Moline Properties v. Commissioner, 319 U.S. 436, 438-439 (1943).

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [Id.; fn. ref. omitted.]

The degree of corporate purpose and activity requiring recognition of the corporation as a separate business entity is extremely low. Strong v. Commissioner, 66 T.C. 12, 24 (1976), affd. without published opinion 553 F.2d 94 (2d Cir. 1977). Kolonaki carried on business activity. It entered into contracts, such as the Supply Agreement with Alexia. Kolonaki owned the GRS stock and filed its own corporate tax returns. Kolonaki's business activities, separate from Georgiou's personal affairs, are sufficient evidence of Kolonaki's status as a

separate legal entity from Georgiou. "The fact is that * * * [the taxpayer] did have a separate legal existence with privileges and obligations entirely separate from those of its stockholders. The fact that it had only one stockholder seems of no legal significance." Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 419 (1932).

The analysis in Moline Properties can also be applied to distinguish Georgiou and JAI as separate legal entities. Georgiou evaluated the purchase of Petite in his individual capacity. He decided to incorporate JAI based on several business reasons, including Georgiou's desire to withhold Kolonaki's financial information from lessors of Petite stores and because Kolonaki had just divested itself of its retail division creating GRS. Georgiou's business reasons for forming JAI and its subsequent business activity establish JAI as a separate legal entity from Georgiou. See Moline Properties v. Commissioner, supra at 438.

The consequence of the separate legal status of Kolonaki, Georgiou, and JAI is that their overt acts must be analyzed independently. Kolonaki asserts that it was the beneficial owner of JAI stock even though it was not the record owner. We agree that record ownership is not necessary to satisfy the "directly owned" requirement in section 1504(a). The cases where courts have permitted a division of legal and beneficial ownership,

however, typically involve facts (1) where the legal and beneficial owner divests itself of legal ownership and retains the beneficial ownership for a legitimate business reason (see Miami National Bank v. Commissioner, supra; Macon, Dublin & Savannah R.R. Co. v. Commissioner, supra) or (2) where an entity creates another to act as its agent to acquire legal title, while vesting beneficial ownership in itself (see Commissioner v. Bollinger, 485 U.S. 340 (1988)).

Kolonaki relies on Miami National Bank and Macon, Dublin & Savannah R.R. Co. to support its assertion of beneficial ownership. These cases are distinguishable on the facts. In Miami National Bank, a corporation retained beneficial ownership when it transferred record title of shares of stock to a subordinated securities account. The corporation retained substantial rights under the agreement, including the right to dividends, right to vote the stock, and right to withdraw the stock if other readily marketable securities of equivalent value were substituted.

In Macon, Dublin & Savannah R.R. Co., a corporation transferred record title of the stock of its subsidiary to a nominee while retaining beneficial ownership. The nominee agreement stated that the corporation was entitled to all rights and privileges incident to the stock and had the option to

repurchase the stock.  Both parties understood that the transferee was acting as a nominee.

In contrast to the foregoing cases, here Kolonaki never held record title to JAI stock.  JAI stock was originally issued in Georgiou's name, when Georgiou made the capital contributions to JAI, and the stock has remained in Georgiou's name through the years in issue.  No contemporaneous agreement was created between Kolonaki and Georgiou that set forth the beneficial ownership arrangement and the parties' rights.

Kolonaki also relies on Bollinger to establish beneficial ownership.  In Bollinger, the Court sought to determine whether an agency relationship existed between the record owner and the beneficial owner of property.  The Supreme Court held that a corporation that was formed to avoid Kentucky usury laws was an agent for the partnership and stated in part:

> It seems to us that the genuineness of the agency
> relationship is adequately assured, and tax-avoiding
> manipulation adequately avoided, when the fact that the
> corporation is acting as agent for its shareholders
> with respect to a particular asset is set forth in a
> written agreement at the time the asset is acquired,
> the corporation functions as agent and not principal
> with respect to the asset for all purposes, and the
> corporation is held out as the agent and not the
> principal in all dealings with third parties relating
> to the asset.  * * *  [Commissioner v. Bollinger, supra
> at 349-350.]

In the instant cases, there was no credible evidence of an agreement, written or otherwise, that established that Georgiou acted as Kolonaki's agent when Georgiou formed JAI.  Georgiou

provided the funds to capitalize JAI and to finance the purchase of Petite.  Georgiou held himself out as the principal in dealings with third parties, such as when Georgiou purchased Petite using JAI as his nominee.  Georgiou transferred the JAI stock into his living trust and signed the trust document.  The minutes of the JAI board of directors meetings reflect that it was Georgiou, not Kolonaki, who ran the operations of JAI and made business decisions.  The facts here are easily distinguishable from Bollinger, where "In every case, * * * [third parties] were aware that the corporation was acting as agent of the partnership in holding record title."  Id. at 343-344.

Kolonaki provided documents to the IRS agent in an attempt to substantiate Kolonaki's beneficial ownership of JAI.  The documents consisted of a Holding Agreement, a Supply Agreement, promissory notes with assignments, and minutes of JAI and Kolonaki board meetings.  The dates on the documents ranged from 1988 through 1990.  These documents do not establish beneficial ownership during 1990 because the documents were either created or altered in 1991 and were backdated.

In INI, Inc. v. Commissioner, T.C. Memo. 1995-112, a corporation and its wholly owned subsidiary attempted to separate by executing legal documents and transferring assets and liabilities.  The corporation and its subsidiary had filed

consolidated returns in the past and presented irrevocable proxies and an agreement dated September 30, 1988, as evidence of an earlier separation.  INI, Inc., alleged that the agreement and proxies were backdated and therefore did not take effect until after September 30, 1988.  This Court stated in part:  "In the event that we were to determine that the execution of the irrevocable proxies occurred sometime after September 30, 1988, it would then become necessary for us to determine when the Agreement became effective and whether it was sufficient to deconsolidate the entities."  Id.  Here we conclude that the contemporaneous documents belie any claim that the backdated documents memorialize the actual agreement at the earlier and crucial date.  See Saigh v. Commissioner, 36 T.C. 395, 420 (1961).

On brief, Kolonaki argues that it has beneficial ownership of JAI stock because JAI and Kolonaki are effectively one business unit, administered as one company with Georgiou as the head of the economic entity.  A similar argument was rejected in Ray Engineering Co. v. Commissioner, 42 T.C. 1120 (1964), affd. 347 F.2d 716 (3d Cir. 1965).  In Ray Engineering Co., the taxpayer filed consolidated returns based on operation of the two corporations as a business unit with the same executive officer who owned all of the stock in both corporations.  The Court held that there was "no common parent" within the meaning of section

1504 of the 1954 Code [1504(a) of the 1986 Code] and stated in part:

> Since neither * * * [the taxpayer] nor Branch was connected through stock ownership with a common parent, the basic requirement of section 1504 has not been met. * * * [The taxpayer] and Branch were not members of an affiliated group under section 1504 and therefore were not entitled to file a consolidated return under section 1501. * * * [Id. at 1122.]

For the same reason, we reject Kolonaki's argument here.

In sum, Kolonaki is a separate legal entity from Georgiou and JAI. Kolonaki never held record title to JAI stock, and Georgiou was not Kolonaki's agent. Kolonaki did not present any credible documentation that would substantiate Kolonaki's beneficial ownership of JAI stock as of the controlling date. We conclude, therefore, that Kolonaki did not have beneficial ownership of JAI stock as required by the "directly owned" provision in section 1504(a). We sustain respondent's determination that Kolonaki is not entitled to file a consolidated return with JAI; therefore, Kolonaki cannot deduct a loss from JAI on its 1990 tax return.

II. Georgiou

Georgiou asserts that the advances from Kolonaki's Account 121--Loan to Shareholder were nontaxable loans that he intended to repay. Respondent contends that the advances were taxable distributions, i.e., dividends, that were includable in Georgiou's taxable income. Respondent argues that, at the time

the funds were transferred, there was no intent to repay the advances because there was no fixed time and plan for repayment; no maturity date; no ceiling placed on the advances; no promissory notes; and the documentation provided at audit consisted of backdated corporate minutes, a backdated security agreement, backdated promissory notes, and changed accounting records.

Georgiou further asserts that he is entitled to a $76,605 business interest deduction in relation to the advances. Respondent contends that there is no allowable interest deduction because the advances are not loans.

Whether advances from a corporation to its shareholder constitute bona fide loans is a factual question and depends on the existence, at the time the advances occurred, of an intent on the shareholder's part to repay the advances and an intent on the corporation's part to enforce the obligations. Berthold v. Commissioner, 404 F.2d 119, 122 (6th Cir. 1968), affg. T.C. Memo. 1967-102. As the state of a taxpayer's mind at a given time in the past is not directly ascertainable, we must consider objective evidence. See Baird v. Commissioner, T.C. Memo. 1982-220. The issue thus turns upon all of the circumstances surrounding the transactions. Wiese v. Commissioner, 93 F.2d 921 (8th Cir. 1938), affg. 35 B.T.A. 701 (1937). Where the shareholder receiving the advances controls the corporation,

however, we must carefully scrutinize the transactions. Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970).

In determining whether the shareholder and the corporation each possessed the requisite intent at the time of the advances, the courts have examined a number of factors, including the following: The existence of a fixed time and plan for repayment; whether a ceiling was placed on advances; whether there was accrual and payment of interest; whether the loans were recorded on the corporate books; if there has been a failure to repay a mounting loan balance; who had control over the decision to enforce the obligation; whether debt instruments were executed; the existence of earnings and profits; whether dividends were paid; whether there is corroborated, credible testimony of the taxpayer; the salary received by the shareholder; and the shareholder's ability to repay. See, e.g., Berthold v. Commissioner, supra at 121; Wiese v. Commissioner, supra at 923; Baird v. Commissioner, 25 T.C. 387 (1955); Baird v. Commissioner, T.C. Memo. 1982-220.

Because of the nature of this issue, the above factors are not exclusive, and no one factor is determinative. The factors merely represent objective evidence helpful to the courts in analyzing all of the relevant facts and circumstances.

Georgiou relies most heavily upon the books and records of Kolonaki and upon purported loan repayments as evidence of his intention to repay the advances. Georgiou refers to two documents to support his position: The Security Agreement, dated 1980, which gave Kolonaki a present security interest in Georgiou's personal assets, and the Consent by Directors document, dated 1988, which established a maturity date and interest rate for the advances.

Prior to the creation of the Consent by Directors document, there was no interest rate and no interest accrued on the advances. Both of these documents, however, were created in 1991 and backdated. This Court's analysis in Saigh v. Commissioner, 36 T.C. at 420, provides an appropriate response to Georgiou's arguments:

> [Taxpayers] argue that actions taken subsequent to the date of transfer, when combined with the original event, clearly establish the real intention of the parties. They rely upon the confirmation of the loan by the directors of Building Inc. and Investment and the execution and acceptance of the note. This action was not undertaken until 2 months after the transaction in issue occurred. No explanation is given of why nothing was done or said at the July 25, 1946, meeting. While the confirmation and note would ordinarily be some evidence, other facts present in the record destroy their probative value. The actions taken were tardy, and undertaken only after reflection and a shift in opinion. [Taxpayers] would overlook the interlocking control between Investment and Building Inc. What was done was not the act of independent directors, i.e., it was not the result of bargaining between parties, each looking after his own self interest. Saigh acted on both sides and, indeed,

guided and engineered the entire transaction step by step.

In Baird v. Commissioner, 25 T.C. at 394-395, we reached a similar conclusion:

> Nor do we regard the giving of demand notes dated February 2, 1953, to Baird & Company * * * of any significance as indicating that [taxpayer's] withdrawals constituted debts, since this was done only after the revenue agent took the position that the "loans" were in fact disguised dividends. To us, it is incredible that the Baird brothers would have waited more than 6 years to execute a note for the $17,540 if they had intended to do so in the first place. It seems obvious that the execution of the notes was a mere afterthought directed to an effort to give the withdrawals a character which they did not have during the years when they were made. * * *

Accordingly, the backdated documents that provide an interest rate and maturity date will be given little weight in our determination because they were created after the years in issue and substantially later than the actual advances. "The determinative fact is the intention as it existed at the time of the transaction. This intention cannot be vitiated by changed circumstances or subsequent action bred in the cold light of tax consequences." Saigh v. Commissioner, supra at 420.

Georgiou's repayments of advances consisted primarily of adjustments to journal entries. Total advances for 1989 and 1990 were $857,360 and $2,608,562, respectively. The 1989 repayments consisted of a check for $325,000 and a journal entry. All of the 1990 repayments were journal entries made in 1991 in an attempt to reduce the balance of the Loan to Shareholder account.

In Baird, this Court also addressed the issue of journal entries as payments and stated:

> Separate treatment of the joint accounts on the books is not sufficient to support a contrary view in the light of all the surrounding circumstances, and the $17,540 debit from the cash journal to "Notes Receivable" account was simply a shift from one account to another. There is nothing here to indicate a plan or intention to repay, and the conduct of the parties over a period of years supports a contrary view. [Baird v. Commissioner, 25 T.C. at 394.]

Disregarding the repayments that consisted of journal entries made in 1991, the repayments are insubstantial in relation to the advances. Failure to repay an ever mounting loan balance points to constructive dividends. See Baird v. Commissioner, T.C. Memo. 1982-220.

Georgiou also relies on the treatment of the advances on the books and tax returns of Kolonaki to establish that the advances were loans. Kolonaki recorded the advances in the Loan to Shareholder account. Although the treatment of the advances is an important factor to consider, it must be considered in relation to the other facts that would indicate a loan.

> While it is true that the absence of the notes and the failure to charge or pay interest are not alone conclusive on the basic issue, it is equally true that the treatment of * * * [the taxpayers'] withdrawals on the corporate books as "Notes Receivable" is not controlling, since it is well settled that book entries may not be used to conceal realities as a means of relieving the taxpayer from liability for income taxes. * * * [Baird v. Commissioner, 25 T.C. at 395.]

On brief, Georgiou asserts that his annual income of $1 million is evidence of his ability to repay the debt. This assertion contradicts Georgiou's Form 1040 tax returns for 1989 and 1990 that report adjusted gross income of $218,281 and $283,987, respectively. Where a sole shareholder receives no salary from a corporation, other disbursements, represented as "loans", may in reality constitute salary substitutes. Receipt of salaries denominated as such, on the other hand, may support the characterization of other disbursements as loans. See Baird v. Commissioner, T.C. Memo. 1982-220. Although Georgiou received a salary from Kolonaki, he testified that the salary was very low. The low salary would have been Georgiou's only remuneration from Kolonaki, because Kolonaki never paid dividends, despite substantial earnings and profits in both 1989 and 1990. A history of failure to pay dividends in the face of earnings and profits available for that purpose tends to show that "loans" are camouflaged dividends. Id.

Georgiou's final argument, i.e., that the advances were loans because there were ceilings placed on the amount of the advances, is unpersuasive. The line of credit that Kolonaki extended to Georgiou increased approximately every 2 years. It was Georgiou, as the sole shareholder of Kolonaki, who had the authority to increase the line of credit. Similarly, it was Georgiou, as the sole shareholder, who had the authority to enforce the obligations. Courts strictly scrutinize transactions

between a corporation and its sole shareholder. That the shareholder, in effect, has the sole authority to enforce the debt against himself certainly raises questions about the substantive significance of formal debt instruments and book entries. Saigh v. Commissioner, supra at 420.

The record herein contains little or no reliable evidence in support of Georgiou's position. Kolonaki classified the advances as loans on its books and records, and Georgiou made a small repayment during the years in issue. These factors are outweighed by the absence of credible documents that would substantiate Georgiou's intent to repay the advances at the time the advances were made. The backdated documents that reflect a security agreement, maturity date, and an interest rate for the advances are not reliable. The ceiling on the advances and the right to enforce the obligations are illusory because Georgiou, himself, controlled these decisions.

Noticeably absent are promissory notes. A taxpayer's execution and delivery to the corporation of promissory notes or other debt instruments in connection with, and in close temporal proximity to, the corporate disbursements is evidence that they are loans. See Baird v. Commissioner, T.C. Memo. 1982-220. No promissory notes were executed for the advances from the Loan to Shareholder account from 1980 through the years in issue.

After considering the factors that distinguish loans from dividends, we conclude that Georgiou has failed to satisfy his

burden of proof on this issue.  Therefore, we sustain respondent's determination that the advances to Georgiou from Kolonaki were constructive dividends and not loans.  Accordingly, respondent's determination that there is no allowable business interest deduction on the advances is also sustained.

Because we have concluded that Georgiou did not transfer JAI stock to Kolonaki during the years in issue, we need not consider whether Georgiou would have received a section 304 dividend as a result of such a transfer.

III.  GRS

GRS contends that the value of its 1989 opening inventory was $935,181.  GRS reached this conclusion based on a lengthy analysis of fair market value.  Respondent contends that the correct valuation is determined by sections 351(g)(2) and 362(a).

GRS obtained its 1989 opening inventory from Kolonaki.  When Kolonaki divested itself of its retail division, Kolonaki transferred assets, including inventory, to GRS in exchange for GRS stock.  The exchange was treated as a section 351 exchange. Section 351(g) refers to section 362(a), which sets forth the basis of the transferred assets:

SEC. 362 BASIS TO CORPORATIONS.

(a) Property Acquired by Issuance of Stock or as Paid-In Surplus.--If property was acquired on or after June 22, 1954, by a corporation--

(1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or

(2) as paid-in surplus or as a contribution to capital,

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

The applicability of section 351 to the Kolonaki/GRS exchange is not in controversy. Similarly, it is not disputed that Kolonaki controlled GRS after the exchange as required by section 362. The use of fair market value by GRS to determine the basis of the assets is inappropriate. The present facts fit squarely within the language of the Code. Therefore, we sustain respondent's determination that the value of the opening inventory of GRS is equal to the basis of the inventory in the hands of the transferor.

IV. Additions to Tax and Penalties

Section 6653(a)(1) imposes an addition to tax in an amount equal to 5 percent of the underpayment if any part of the underpayment is due to negligence or disregard of rules or regulations. Section 6661 imposes an addition to tax in an amount equal to 25 percent of the underpayment if the underpayment is attributable to a substantial understatement. Both sections 6653(a)(1) and 6661 apply to tax returns with a due date prior to December 31, 1989. The sections were repealed December 31, 1989, with the current sections both recodified in section 6662, effective for returns with a due date after December 31, 1989. Kolonaki and JAI had a fiscal year ending September 30. The Georgious were calendar year taxpayers.

Section 6662(a) imposes a penalty for the underpayment of tax in an amount equal to 20 percent of the underpayment if the underpayment is attributable to negligence or disregard of rules or regulations or to any substantial understatement of income tax.

"Negligence", as used in section 6653(a)(1), is defined as the "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985). Negligence includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return, including any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Secs. 6653(a)(3), 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Secs. 6653(a)(3), 6662(c); sec, 1.6662-3(b)(2), Income Tax Regs.

For purposes of sections 6661 and 6662(a), an understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $5,000 or, in the case of a corporate taxpayer, $10,000. Secs. 6661(b)(1)(A) and (B), 6662(d)(1)(A) and (B). Where an item is not attributable to a tax shelter, the understatement may be reduced by the portion attributable to such item and the addition to tax accordingly reduced if the

taxpayer's treatment of the item was based on substantial authority or was adequately disclosed in the return or in a statement attached to the return. Secs. 6661(b)(2)(B)(i) and (ii), 6662(d)(2)(B)(i) and (ii). The term "understatement" is defined as the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax shown on the return for the taxable year, reduced by any rebate. Secs. 6661(b)(2), 6662(d)(2)(A).

## A. Section 6662 Penalty

Respondent determined that the section 6662 accuracy-related penalty for Georgiou and Kolonaki was based on a substantial understatement or, in the alternative, negligence. Both carry the same penalty. Kolonaki and Georgiou (petitioners) argue that an accuracy-related penalty should not be imposed.

Petitioners rely on section 6664(c), which states that the accuracy-related penalty does not apply with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to that portion. Petitioners contend that they are not liable for the penalty because they reasonably and in good faith relied upon the advice of professionals, specifically, Pryor and Bernard. But reliance on the advice of a professional does not necessarily demonstrate reasonable cause and good faith. Sec. 1.6664-4(b), Income Tax Regs. "Reliance on professional advice, standing alone, is not an absolute defense

to negligence, but rather a factor to be considered.  First it must be established that the reliance was reasonable."  <u>Freytag v. Commissioner</u>, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

Respondent maintains that petitioners may not rely on the advice of Bernard and Pryor for protection from the penalty.  Respondent argues that petitioners, Bernard, and Pryor conspired to prepare and present to the IRS backdated documents and accounting entries.  We agree with respondent.

Petitioners "instructed" Pryor and Bernard rather than relied on them.  Bernard testified:

> If I had to describe myself in connection with all of my activities for Mr. Georgiou, if I had to draw the distinction between scrivener and business adviser, I would describe myself as a scrivener.  I would produce documents to reflect agreements that had been reached by the client.

Bernard stated that he had not seen the financial records or tax returns of petitioners' corporations and that he would "absolutely not" describe himself as Georgiou's or Kolonaki's tax adviser.  Regarding Kolonaki, Bernard testified as follows:

> Q  Did you feel it was necessary in your role as counsel, business counsel, to know something about the finances of the corporate client?
>
> A  Not only didn't I, because I wasn't giving Mr. Georgiou financial advice, but I felt that if I had inquired about financial information about Kolonaki I would have been rebuffed and it would have damaged my relationship with the client.

Additionally, assuming petitioners relied on counsel to provide them with advice, petitioners disregarded the advice. With respect to the advances, Bernard testified:

> Q  Did you advise Mr. Georgiou at any time with respect to whether or not he should prepare promissory notes?
>
> A  Yes.
>
> Q  Or whether it was a good idea to prepare promissory notes?
>
> A  Yes, of course.  Again, as a routine I advise clients that they must--they should treat their corporations as separate entities and not just another side of their trouser pocket, that any time money flows from the corporation to them it has consequences.  And if it's a loan, it needs to be reflected by a promissory note.  It's always better if it's secured. And the note must be for a reasonable period of time and must require payments.

Pryor testified on the consolidated return issue as follows:

> Q  And how did you know to focus on the issue of beneficial ownership?
>
> A  * * *  I looked up in a source we have called the Bureau of National Affairs, it's a tax service, and what the criteria is for filing a consolidated return. I think up to that point [spring 1991] I have been informed that George was the owner of Judy Alexander [JAI].
>
> And I think in that meeting, I said, Well, we cannot file a consolidated return unless we can show that there's beneficial ownership between Kolonaki and JAI Alexander.  Even though someone is the nominal owner, if we can show beneficial ownership, then it would be possible to file a consolidated return.

The evidence is substantial that Georgiou, Pryor, and Bernard then attempted to "show" beneficial ownership by fabricating and altering documents.  The same strategy was used

to substantiate that the advances to Georgiou were loans.  The Holding Agreement, Supply Agreement, promissory notes, adjustments to books and records, and minutes were either created or altered, and backdated, in an attempt to deceive the IRS agent.  (At the conclusion of trial, respondent moved to amend the answer to allege fraud.  The motion was denied as untimely.)

Georgiou testified that he did not read many of the documents he signed in either his individual capacity or as president of Kolonaki.  Even if he did not read them, we attribute knowledge of the documents to him.  See Bollaci v. Commissioner, T.C. Memo. 1991-108.  The voluntary failure to read a return and blind reliance on another for the accuracy of a return are not sufficient bases to avoid liability for negligence additions to tax.  Id.  See, e.g., Bagur v. Commissioner, 66 T.C. 817, 823-824 (1976), remanded on other grounds 603 F.2d 491 (5th Cir. 1979); Bailey v. Commissioner, 21 T.C. 678 (1954).

Petitioners' assertion that they relied on their professional advisers is unpersuasive and incredible.  Accordingly, we sustain respondent's determination that petitioner Georgiou is liable for the section 6662(a) accuracy-related penalties for 1989 and 1990 and that petitioner Kolonaki is liable for the section 6662(a) accuracy-related penalty for 1990.

B.  <u>Sections 6653(a) and 6661 Additions to Tax</u>

Respondent determined an addition to tax for Kolonaki in 1989, under sections 6653(a)(1) and 6661.  Kolonaki did not present any evidence on the negligence and substantial understatement determinations for the 1989 tax year.  Because Kolonaki did not meet its burden of proof, we sustain respondent's determination that Kolonaki is liable for the additions to tax under sections 6653(a)(1) and 6661 for 1989.

Respondent has conceded the additions to tax under sections 6653(a) and 6661 with respect to GRS.

To reflect the foregoing and concessions of the parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.
